No. 14-1764

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
Appellee,

v.

GERALD J. SILVA,
Defendant-Appellant.

ON APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BRIEF FOR THE UNITED STATES

PETER F. NERONHA
United States Attorney

DONALD C. LOCKHART
Assistant U.S. Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5030

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................i

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE ......................................................... 1

SUMMARY OF ARGUMENT ........................................................24

ARGUMENT ..............................................................................26

I.    The Vagueness Claim is Foreclosed and Meritless............................26

II.    The Grand Jury Claim Fails........................................................30

    A.    Introduction and standard of review ...........................................30

    B.    The claim is foreclosed..........................................................30

    C.    This is not a "no evidence" case.................................................40

    D.    *Mechanik* renders any error harmless ........................................42

III.    Exclusion of Leo's Testimony was Not Reversible Error.................45

    A.    There was no abuse of discretion.................................................45

    B.    Any error was harmless..........................................................49

IV.    There was No Error in the Jury Instruction Phrasing....................51

    A.    Introduction and standard of review ...........................................51

B.    The first instruction claim is meritless.......................................51

C.    The second instruction claim is meritless.................................56

V.    The Evidence was More than Sufficient.................................................57

A.    There were countless pornographic images .............................57

B.    There was ample proof of knowledge.........................................61

CONCLUSION ......................................................................................................66

CERTIFICATE OF COMPLIANCE ..................................................................67

CERTIFICATE OF SERVICE ............................................................................67

## Addendum Table of Contents

1.    District court's published opinion .............................................................1

2.    District court's rulings denying pre-trial motions...............................7

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Bank of Nova Scotia v. United States,*
   487 U.S. 250 (1988) ............................................................................ 33

*Costello v. United States,*
   350 U.S. 359 (1956) .................................... 31, 32, 33, 34, 35, 36, 37, 38

*Goodrich v. Hall,*
   448 F.3d 45 (1st Cir. 2006) ................................................................ 44

*Hamling v. United States,*
   418 U.S. 87 (1974) .............................................................................. 54

*Holt v. United States,*
   218 U.S. 245 (1910) ............................................................................ 31

*Kaley v. United States,*
   134 S. Ct. 1090 (2014) .................................................................. 34, 35

*Lawn v. United States,*
   355 U.S. 339 (1958) ...................................................................... 32, 33

*Miller v. California,*
   413 U.S. 15 (1973) .............................................................................. 27

*National Organization for Marriage,*
   *Inc. v. McKee,*
   669 F.3d 34 (1st Cir. 2012) ................................................................ 28

*New York v. Ferber,*
   458 U.S. 747 (1982) ............................................................................ 27

*Reno v. American Civil Liberties Union,*
   521 U.S. 844 (1997) ............................................................................ 28

*United States v. Alexander,*
   789 F.2d 1046 (4th Cir. 1986)..............................................................37

*United States v. Almeida,*
   748 F.3d 41 (1st Cir. 2014) ...................................................................57

*United States v. Alzanki,*
   54 F.3d 994 (1st Cir. 1995) ...................................................................48

*United States v. Amirault,*
   173 F.3d 28 (1st Cir. 1999) ...................................................................60

*United States v. Arvin,*
   900 F.2d 1385 (9th Cir. 1990).............................................................47

*United States v. Batchu,*
   724 F.3d 1 (1st Cir.),
   *cert. denied,* 134 S. Ct. 663 (2013) ...............................................58, 60

*United States v. Brennick,*
   405 F.3d 96 (1st Cir. 2005) ...................................................................44

*United States v. Calandra,*
   414 U.S. 338 (1974)......................................................................33, 36

*United States v. Capozzi,*
   486 F.3d 711 (1st Cir. 2007) ...........................................................36, 39

*United States v. Casas,*
   425 F.3d 23 (1st Cir. 2005) ...............................................................36, 44

*United States v. Catalán-Roman,*
   585 F.3d 453 (1st Cir. 2009) .................................................................49

*United States v. Cruz,*
   478 F.2d 408 (5th Cir. 1973).................................................................38

*United States v. Downsbrough,*
  2013 WL 5781570 (E.D. Tenn. 2013)..................................................61

*United States v. Knox,*
  32 F.3d 733 (3d Cir. 1994) ............................................................60

*United States v. Frabizio,*
  459 F.3d 80 (1st Cir. 2006) ..............................................28, 47, 58, 60

*United States v. Guerrier,*
  669 F.3d 1 (1st Cir. 2011) ..................................................30, 36

*United States v. Guzman,*
  603 F.3d 99 (1st Cir. 2010) ................................................49

*United States v. Hilton,*
  257 F.3d 50 (1st Cir. 2001) ................................................60

*United States v. Hussein,*
  351 F.3d 9 (1st Cir. 2003) ..................................................29

*United States v. Johnson,*
  767 F.2d 1259 (8th Cir. 1985).........................................38

*United States v. Jones,*
  689 F.3d 12 (1st Cir. 2012),
  *cert. denied*, 133 S. Ct. 1278 (2013) ....................................46

*United States v. Larkin,*
  629 F.3d 177 (3d Cir. 2010) ..............................................60

*United States v. Maceo,*
  873 F.2d 1 (1st Cir. 1989) ................................................35

*United States v. Mack,*
  892 F.2d 134 (1st Cir. 1989) ............................................35

*United States v. Maguire,*
  918 F.2d 254 (1st Cir. 1990) ............................................................... 55

*United States v. Mechanik,*
  475 U.S. 66 (1986) ............................................... 2, 42, 43, 44

*United States v. Mills,*
  995 F.2d 480 (4th Cir. 1993) ........................................... 37, 44

*United States v. Ogden,*
  685 F.3d 600 (6th Cir. 2012) ............................................... 61

*United States v. Osborne,*
  935 F.2d 32 (4th Cir. 1991) ............................................... 61

*United States v. Pires,*
  642 F.3d 1 (1st Cir. 2011) ............................................... 46

*United States v. Powell,*
  823 F.2d 996 (6th Cir. 1987) ............................................... 38

*United States v. Price,*
  775 F.3d 828 (7th Cir. 2014) ............................................... 28

*United States v. Pridgen,*
  518 F.3d 87 (1st Cir. 2008) ............................................... 49

*United States v. Ramos-González,*
  775 F.3d 483 (1st Cir. 2015) ........................................... 51, 55

*United States v. Riley,*
  292 Fed. Appx. 717 (10th Cir. 2008) ............................................... 38

*United States v. Rivera,*
  546 F.3d 245 (2d Cir. 2008) ............................................... 28

*United States v. Romero,*
  585 F.2d 391 (9th Cir. 1978) ............................................... 38

*United States v. Roth,*
    777 F.2d 1200 (7th Cir. 1985) ............................................................. 38

*United States v. Russell,*
    662 F.3d 831 (7th Cir. 2011) ............................................................... 47

*United States v. Sabetta,*
    373 F.3d 75 (1st Cir. 2004) ................................................................. 55

*United States v. Sanabria,*
    645 F.3d 505 (1st Cir. 2011) ............................................................... 49

*United States v. Santiago,*
    775 F.3d 104 (1st Cir. 2014) ............................................................... 29

*United States v. Schuster,*
    706 F.3d 800 (7th Cir. 2013) ............................................................... 60

*United States v. Schwarte,*
    645 F.3d 1022 (8th Cir. 2011) ............................................................. 61

*United States v. Short,*
    671 F.2d 178 (6th Cir. 1982) ......................................................... 37, 38

*United States v. Silva,*
    2014 WL 2573334 (D. R.I. 2014) ......................................................... 3

*United States v. Stradwick,*
    46 F.3d 1129 (4th Cir. 1995) ............................................................... 44

*United States v. Tetioukhine,*
    725 F.3d 1 (1st Cir. 2013) ................................................................... 46

*United States v. Torres-Rosario,*
    658 F.3d 110 (1st Cir. 2011) ............................................................... 49

*United States v. Valdivia,*
    680 F.3d 33 (1st Cir. 2012) ................................................................. 55

*United States v. Wiegand,*
  812 F.2d 1239 (9th Cir. 1987) ...........................................................27

*United States v. Wilder,*
  526 F.3d 1 (1st Cir. 2008) ...............................................................60

*United States v. Williams,*
  553 U.S. 285 (2008) ...................................................... 27, 33, 35, 53

*United States v. Wolf,*
  890 F.2d 241 (10th Cir. 1989) .....................................................29, 60

*United States v. X-Citement Video,*
  *Inc.*, 513 U.S. 64 (1994) .............................................................27, 28, 51

*United States v. Zhen Zhou Wu,*
  711 F.3d 1 (1st Cir.),
  *cert. denied*, 134 S. Ct. 365 (2013) ....................................................26

*Woodstock v. Amaral,*
  511 F.2d 985 (1st Cir. 1974) ............................................................33

## Statutes

18 U.S.C. § 1461 ...................................................................................54

18 U.S.C. § 2252(a)(2)............................................................................2

18 U.S.C. § 2252(a)(2)(A).....................................................................26

18 U.S.C. § 2252(a)(4)............................................................................2

18 U.S.C. § 2252(a)(4)(B)(i) .................................................................26

18 U.S.C. § 2256 ...........................................................................26, 54

18 U.S.C. § 2256(2)(A)(v).....................................................................26

## <u>Rules</u>

Fed. R. Crim. P. 6 ................................................................................ 42

Fed. R. Evid. 1006 ............................................................................. 48

Fed. R. Evid. 403 ............................................................................... 46

Fed. R. Evid. 702 ............................................................................... 46

Fed. R. Evid. 702(a) ........................................................................... 46

## STATEMENT OF THE ISSUES

1.     Whether (a) settled precedent forecloses the due process vagueness claim, and (b) the claim is meritless in any event.

2.     Whether (a) settled precedent forecloses the challenge to the adequacy of the evidence presented to the grand jury on Count 7, (b) the claim fails on the facts, and (c) any error was rendered harmless by the petit jury's verdict.

3.     Whether (a) the district court abused its discretion in excluding the testimony of a retired English professor, and (b) any error was harmless.

4.     Whether (a) the district court's choice of phrasing in two jury instructions was an abuse of discretion, and (b) any error was harmless.

5.     Whether a rational jury could conclude that (a) one or more images underlying each count of conviction involved the lascivious display of the genitals, and (b) defendant acted with the requisite knowledge in the case of Counts 1-6.

## STATEMENT OF THE CASE

### 1.     Procedural history

A District of Rhode Island grand jury charged Gerald J. Silva with six counts of receiving child pornography, 18 U.S.C. § 2252(a)(2), and one count of possessing child pornography, 18 U.S.C. § 2252(a)(4), based on DVDs of young boys displaying their genitals in a lascivious manner. (1:17-19.)[1] The six receipt counts were based on specific DVDs. (1:17-18.) The possession count did not list particular DVDs. (1:18.)

The indictment stemmed from an international investigation of the Canadian entity that created the DVDs using raw footage of nude boys who were exploited in Eastern Europe – an investigation that has generated scores of prosecutions globally. (1:238-258.)

Silva sought a bill of particulars to clarify whether the possession count was based on the same DVDs that were listed in the receipt counts. (Docket No. 31.) In response, the government (1) elected to rely on three distinct DVDs in support of the possession count, and (2) added still-photo DVDs to two of the receipt counts. (Docket Nos. 39, 39-1.)

---

[1] The two-volume appendix is cited as "1:__" and "2:__." Exhibits are cited as "Ex__." The government's addendum is cited as "GA:__." District court filings are cited by docket number.

Silva also moved to: (1) dismiss the indictment on grounds that (a) inadequate evidence was presented to the grand jury (Docket Nos. 36, 50), and (b) the charged statutes were unconstitutionally vague as applied to him (Docket Nos. 38, 46, 48); and (2) admit the testimony of a retired English professor who was a purported "expert" on sexuality in films (Docket Nos. 53, 61). The government opposed the motions. (Docket Nos. 43, 44, 56, 59.) After a hearing (1:20-121), the district court (Smith, C.J.) denied them (GA:8-21).

Following a three-day trial, a jury convicted Silva on all counts after deliberating for an hour or less. (2:251-257,527-528.) Silva filed post-trial motions for judgment of acquittal and a new trial, mainly on the basis that the images in the charged DVDs were not pornographic. (Docket No. 72.) The government opposed the motions. (Docket No. 75.) The district court denied them in a published opinion. *United States v. Silva*, 2014 WL 2573334 (D. R.I. 2014) (GA:1-6).

On June 27, 2014, the district court sentenced Silva to 72 months in prison. (2:563-565.) He timely appeals. (1:13-14.)

## 2.    Offense facts

### A.    Overview

A Toronto-based entity called "Azov Films" and "4P5P" produced and sold videos of nude boys engaged in seemingly random conduct designed to showcase their genitals. (1:297-299,312,326,336; 2:419-427; *infra* 8-23.) Azov received the raw footage from Eastern Europe, where the boys were filmed, edited it and added special features, and burned the finished product onto DVDs. (1:302-309,321-330,340; 2:331-336,340-342,359,419-427; *infra* 8-23.) The DVDs were then enclosed in cases displaying the title of the film and various graphics, and shipped to customers around the world. (1:302,306-307,309,326,343-346,352-353, 359; 2:335-336,419-427.)

On May 1, 2011, Canadian authorities searched the Azov facility and shut it down. (1:298-309,320-330; 2:331-342.) They also severed the company's website from the internet, so that anyone trying to visit it would get an error message. (1:321-322,325-326,380-381.)

Silva lived alone in a single-family house in Coventry, Rhode Island. (1:397-402; 2:309.) He was a state probation officer who worked with convicted sex offenders. (1:443,505.)

Over a six-month period, between October 2010 and April 2011, Silva placed 22 orders through the Azov website for video and "bonus photo" DVDs, buying 75 items in all. (1:341-347,351-352,363-381,396, 406-407,437-438; 2:263-308,383-418.) The purchases totaled $1,589. (1:396-397.) The nine video DVDs and two "bonus photo" DVDs that formed the basis of the indictment are described below. (*Infra* 8-23.)

After the Azov website was shut down, Silva tried to access it and presumably encountered the error message, which likely alarmed him. (1:374-381,389,409-410.) At this point he began covering his tracks.

On May 11, 2011, Silva emailed a state police colleague to say he had information that might be of "interest." (1:446,522; 2:428.) In a further email the next day, Silva reported he had "discovered a website called AZOV" that focused on "nude boys" and appeared to have Russian ties, and that he suspected Azov might be involved in dubious activities under the cover of "naturism." (1:523; 2:429.) Silva explained that his concerns were based on several factors, including the fact that the Azov website contained a "Boy Joy" link that "goes to XXX young adult male sex films." (2:429.) Silva said the film previews on the website did not "appear to 'cross the line' into pornography," but that

-5-

they "definitely flirt with the line," and that he thought the boys were "being groomed to perform in the pornographic adult films when they come of age." (2:429.) Silva also said he feared Azov was "doing more with these boys than they are presenting" and that he had "a really bad feeling about what may be happening to those boys." (2:429.) Silva implicitly denied he had placed any orders with Azov, and he took pains to assure his police officer colleague that he did "not intend to find out" about the website's "special offers." (2:429.)

On June 3, 2011, Silva told the same state police officer that the website had "disappeared." (1:529; 2:431.) He added: "I just hope that the Russians are not scurrying back to their home turf to re-establish themselves. I hope the authorities are all over them." (2:431.)

When officers later searched Silva's house, they discovered a room with a large TV and two DVD players. (1:407-408; 2:312-319.) In that room, they found dozens of the DVDs that he had ordered from Azov. (1:401-412; 2:320-328; Ex1-Ex11.) Most of them – including those charged in the indictment – had been opened and apparently played. (1:402.) A few had not been opened. (1:402.) There was also evidence of the mailings of the packages. (1:410-412; 2:322-330; Ex12-Ex14.)

Silva was present during the search. After waiving his right to remain silent, he admitted he had ordered all of the DVDs from Azov. (1:431-436,451; 2:261,263-284.) He also said Azov "may have crossed the line," that the nude boys in the films had been "exploited," and that the producers should be imprisoned. (1:440-441,445.) He claimed, however, that he was merely amassing his DVD collection for a work-related "presentation," while divulging that he himself was an avid "nudist." (1:434,439-444.) He conceded that no one at work had authorized this project. (1:443.) When asked about one of the seized films, featuring a nude, prepubescent boy repeatedly squatting on cupcakes and chicken parts so that the food entered his buttocks (*infra* 18-19), he admitted this went beyond mere "nudism." (1:441-442,469.)

Silva's laptop computer and thumb drive did contain PowerPoint files titled "The Subtle Seduction of Minors with Emphasis on the Male Gender," but the earliest facets of these files were created in July 2011, about two months after the Azov website was shut down. (1:381-386; 2:493-526.) Moreover, other evidence undermined the suggestion that he had created the files for a legitimate presentation. (1:490-503; 2:432-436,471-492,530,536-537.)

Silva testified at trial. In essence, he repeated his story that he was a naturist who enjoyed films about nudity, and that he was afraid Azov might be crossing a line, but that he purchased dozens of Azov DVDs (including the "bonus" still photos) to supply grist for his planned presentation about the "seduction" of young boys, that he watched most of the DVDs, and that he considered all the images to be non-pornographic and merely naturist. (2:26-147.) The "presentation" defense crumbled on cross-examination. (2:88-116,127-143.)

### B.    The charged movies and still photos

### (1)    Count 1: "FKK Waterlogged"

This title consists of a main movie that is 77 minutes long, as well as a "bonus feature" containing nine additional minutes of movie previews. (Ex1; 1:412-418,551-552; 2:419.)[2]

The first 27 minutes of the main movie consists of non-pornographic material, including a disclaimer that the movie is not pornographic, some scrolling text on "naturism," scenes of boys wearing

---

[2] Copies of the DVD exhibits were submitted under seal and can be played on a computer. They are cited by exhibit number and by the elapsed time readouts for specific scenes. One can skip ahead to a cited scene by dragging a toolbar button to the cited start time. One can also fast-forward. The films run about 23 hours and there are 913 photos.

bathing suits at a swimming pool, and scenes of three boys wearing underwear in bed together. (Ex1, 00:00-26:34.)

After this, the three boys who were in bed together enter a shower fully naked, with their penises exposed and in the center of the camera frame. (Ex1, 27:00.) One boy is prepubescent. (*Ibid.*) The other two boys are in their early-mid teens. (*Ibid.*) Over the next seven and a half minutes, the boys stand fully naked in the shower holding a removable shower head, initially spraying water directly down the drain and then on themselves. (Ex1, 27:00-34:34.) The penis of one of the older boys appears to be semi-erect. (*Ibid.*) At one point they begin lathering themselves and each other. (Ex1, 32:13.)

The boys ultimately leave the shower, towel off, and lounge in the bed with their penises fully exposed and in the center of the camera frame, sometimes with their legs spread apart. (Ex1, 34:34-38:00.) Then they get out of bed and hop around as though playing "air guitar," so that their penises bob up and down. (Ex1, 38:00-40:54.) Over the next 20 minutes, the boys lie on the bed together fully naked, massaging each other with oil. (Ex1, 40:54-1:00:42.) After lounging together on the bed, the boys begin to do sit ups on the bed, with their penises sticking

up in the air and swaying back and forth. (Ex1, 1:00:42-1:04:10.) Then they get out of bed and do pushups on the floor with their penises hanging down, apparently so the viewer can see the penises from a different angle. (Ex1, 1:04:10-1:05:40.) Next they do squats and kicks, with the obvious focus being on the jiggling penises. (Ex1, 1:05:40-1:08:35.) In the penultimate scene, one of the older boys wrestles on the bed with the younger boy in a sexually suggestive way for about eight minutes, with penises in full view and occasionally with the anus of the younger boy exposed. (Ex1, 1:08:35-1:16:50.) At the end the three boys stand naked together and wave goodbye. (Ex1, 1:16:50.)

During the movie, no adults are visible, there is no evident plot, the boys speak in a foreign language (Romanian according to the DVD cover) without subtitles, their penises are generally in the center of the camera frame, and their conduct is seemingly random except that it appears designed to highlight their genitals. (Ex1.)

The "bonus feature" portion of the DVD contains some more text on "naturism" and about nine minutes of film previews. (Ex1.) The previewed movies include some benign scenes, but they focus mainly on

prepubescent and early-mid-teen boys fully naked in showers, saunas and outdoors, sometimes massaging each other. (Ex1.)

### (2)    Count 2: "Vladik Remembered Vol. 1"

This title consists of two discs with run times of 107 and 49 minutes, along with an additional 45 minutes of previews. (Ex2; 1:418-420,552-556; 2:420.)

Disc 1. This disc focuses mainly on a boy who appears to be in the early stages of puberty and who is fully naked throughout the vast majority of the scenes. (Ex2, Disc 1.) The disc begins with the same disclaimer and the text about "naturism." (Ex2, Disc 1, 00:00-00:56.) It then shifts to movie "highlights" featuring this boy and other small boys fully naked in showers and saunas, with penises generally at the center of the frame and the exposed anus of one boy as he rocks in a chair. (*Ibid.*, 00:56-01:32.) Although the disc contains beach scenes where this boy and other nude boys are seen at a distance, there are many non-beach scenes in which their naked bodies, and in particular their penises, are the main focus of the action, in settings such as showers, saunas, pools, and a dining area. (*Ibid.*, 32:20-1:12:40, 1:34:07-1:46:30.) The activities of the boys are seemingly random: spraying water on

themselves; sliding on a wet floor and on wet benches; endlessly walking in and out of rooms; eating food; and hitting a ping pong ball against a wall. (*Ibid.*) No adults are visible, there is no apparent plot, and the boys speak in a foreign language (Russian according to the DVD cover) without subtitles. (*Ibid.*) In many cases the camera is clearly drawing attention to penises, although (as with the other movies) there are no zoom shots where a penis fills the entire frame. (*Ibid.*, 47:50-55:50, 58:08-58:50, 1:02:24-1:03:38, 1:05:32-1:06:29, 1:11:56-1:12:40, 1:34:07-1:37:29, 1:41:08-1:46:30.)

Disc 2. This disc focuses on the same young boy and on boys who are in their early-mid teens, all of whom are fully naked throughout virtually all of the movie. (Ex2, Disc 2.) After the standard disclaimer and movie highlights emphasizing the full frontal nudity of the boys, the scene shifts to a shower where the young boy and two older boys stand together and the young boy occasionally rotates in place. (*Ibid.*, 00:00-04:15.) The boys then bat around a ping pong ball and a Hacky Sack in a small apartment, evidently so that the camera can capture their bouncing penises. (*Ibid.*, 04:14-08:10.) After this the boys are seen getting in and out of pools, showers and steam baths, weighing

themselves on a scale, hitting each other with cushions, and drying their hair, with penises and buttocks generally in the center of the frame. (*Ibid.*, 08:10-30:31.) For the next 16 minutes, the young boy and an older boy play chess in the nude on a bed, generally with legs spread apart, with the focus on the penis of the older boy and the buttocks of the younger boy. (*Ibid.*, 30:31-46:13.) At one point in this segment the young boy sits on a chair with legs spread apart, ostensibly meditating in a lotus position, and then flips onto his head so that his anus and testicles are featured. (*Ibid.*, 32:19-34:02.) At another point the camera zooms closer to the young boy's penis. (*Ibid.*, 38:18-38:26.)

Disc 2 also contains 45 minutes of film previews which mainly highlight prepubescent nude boys in a variety of contexts to showcase their bouncing penises. (Ex2, Disc 2, "Trailers.")

### (3)    Count 3: "Vladik Remembered Vol. 2"

This title consists of two separate discs. The first disc is 77 minutes long. The main movie on the second disc is 73 minutes long, with an additional 23 minutes of previews. (Ex3; 1:420,556-557; 2:421.)

Disc 1. This disc features the same young boy and several other boys who are totally nude throughout the vast majority of the scenes,

and who speak in a foreign language (Russian according to the DVD cover) with no subtitles. (Ex3, Disc 1.) After the standard introduction, the young boy and an older boy, who are mainly nude except for sneakers, ostensibly have a picnic together, place aluminum foil on their arms and legs, and then climb on rocks and jump off rocks, so that their penises and buttocks are displayed from different angles. (*Ibid.*, 01:56-21:36.) In the next scene, the young boy and several older boys appear fully nude in a stone grotto that has a pool, shower and steam bath, positioning themselves around a stone wall so that their penises are the focal point of the action and occasionally hitting each other with foam noodles and small branches with leaves. (*Ibid.*, 22:45-49:10.) In the third scene, the young boy and some prepubescent boys climb in and out of a small pool and spray soda on each other, with their penises generally in the center of the frame. (*Ibid.*, 49:10-1:02:13.) In the final scene, the young boy is alone and naked in a bedroom for about 15 minutes, sometimes playing an electric piano and tambourine. (*Ibid.*, 1:02:13-1:16:41.) At one point he stands on an office chair and slowly rotates so that the camera can focus alternately on his penis and buttocks, then he sits in the chair and continues spinning, and then he

stands on the chair again and jiggles around so that his penis bounces – all seemingly random conduct. (*Ibid.*, 1:14:15-1:16:32.) Finally he reclines on the bed with his legs spread apart. (*Ibid.*, 1:16:39-1:16:42.)

Disc 2. The main movie on this disc devotes about 45 minutes to showing fully nude prepubescent boys and older boys endlessly getting into and out of a small pool and steam bath and covering themselves with cream and fake tattoos, including on their penises. (Ex3, Disc 2, 01:53-46:12.) It then features some beach scenes with the young boy from the earlier disc and two prepubescent boys who are fully nude, and a nude soccer game involving other boys. (*Ibid.*, 46:12-1:07:30.) In the final scene, taken in a shack that has a bed and a punching bag, the young boy and two other nude boys punch and kick at the bag so that the camera can capture their penises and open buttocks from different angles, after which the young boy collapses on the bed with his legs spread apart and then moves to a chair with his crotch at the center of attention. (*Ibid.*, 1:07:30-1:13:22.)

Disc 2 also contains 23 minutes of previews similar to the ones mentioned earlier but focusing primarily on very young prepubescent boys. (Ex3, Disc 2, "Trailers.")

### (4) Count 4: "Paul + Calin's Home Video Bucharest" and still photos

This title consists of three discs with run times of 77, 57, and 56 minutes (Ex4), plus two further discs containing 533 still photos (Ex5 & Ex5A). (1:420-424,557-559,574; 2:422.)

Disc 1. This disc features the same boys as shown in "FKK Waterlogged," who speak in a foreign language (Romanian according to the DVD cover) without subtitles. (Ex4, Disc 1.) One is prepubescent and the others are in their early-mid teens. (*Ibid.*) At first the boys take a train ride, walk around a city, and sit in a hotel bedroom, fully clothed. (*Ibid.*, 01:05-22:47.) Then for no apparent reason they strip naked and sit on a bed for five minutes with their legs spread apart and with their penises exposed and at the center of the frame, clearly posing for the camera and doing little else but jostling each other. (*Ibid.*, 22:47-27:45.) Over the next 50 minutes, the prepubescent boy and one of the older boys wrestle with each other in a sexually suggestive way, first on a bed and then on a mattress thrown on the floor, with the camera focusing fairly closely on their penises and at times on the anus of the younger boy, while the other older boy looks on with his penis also exposed. (*Ibid.*, 27:45-1:17:02.)

-16-

Disc 2. This disc features the two boys who wrestled in the last disc. This time they appear in a tiny sleeper compartment on a train, fully nude. For nearly one hour, the boys lounge on the beds, mainly with their legs spread apart and penises exposed, clearly posing for the camera, and occasionally wrestling or jostling each other, without any rhyme or reason. (Ex4, Disc 2, 01:00-57:24.) The camera is nearly always framed on their penises and some shots are quite close. (*Ibid*.)

Disc 3. This disc features the same prepubescent boy and one of the older boys, who appear once again in a tiny sleeper compartment, fully nude. As before, for nearly one hour, the two boys lounge on the beds, mainly with their legs spread apart and penises exposed, clearly posing for the camera, occasionally wrestling and jostling each other and doing pushups to display different views of their penises, and sometimes exposing the anus of the younger boy, in a totally aimless fashion. (Ex4, Disc 3, 01:00-56:40.) The camera is nearly always framed on their penises and some shots are quite close. (*Ibid*.)

Of the 533 images in the bonus photo collection, the first 11 are not pornographic, but the vast majority of the remaining images focus on sexually charged scenes from Discs 1 and 3, with a strong emphasis

on wide open legs and sexually suggestive wrestling, and with the camera frame nearly always centered on penises and open buttocks, with some fairly close shots of both areas. (Ex5; Ex5A.)

### (5)   Count 5: "Cutting Room Floor: Vlaviu" and still photos

This title consists of two discs with run times of 90 and 66 minutes (Ex6), and 380 still photos (Ex7 & Ex7A). (1:424-426,569-570,574; 2:423.) As before, no adults are visible, there is no evident plot, the boys speak in a foreign language (Romanian according to the DVD cover) without subtitles, their penises are nearly always in the center of the camera frame, and their conduct is seemingly random except that it appears designed to highlight their genitals. (*Ibid.*)

Disc 1. In the first scene on this disc, three prepubescent boys are fully naked with each other in what appears to be a living room. (Ex6, Disc 1, 00:57-1:00:18.) At first the boys stand nude for the camera and eat chicken together on a mattress. (*Ibid.*, 00:57-20:00.) For the next 37 minutes, one of the boys squats on dozens of cupcakes placed variously on the mattress, a basketball, and a bicycle seat, with his legs spread wide apart, his penis on clear display, and the crushed cupcakes entering his buttocks as he repeatedly squats on them, evidently

-18-

simulating anal sex from the standpoint of the adult viewer. (*Ibid.* 20:00-57:00.) In the next scene, lasting 30 minutes, the same boy appears fully nude in what appears to be a utility room, where he eats chicken while squatting on a basketball with his legs spread wide apart, and eventually places a chicken breast on the basketball and repeatedly squats on it as he did with the cupcakes, so that the chicken breast goes between his buttocks. (*Ibid.*, 1:00:18-1:30:21.)

Disc 2. This disc highlights scenes from the prior disc where the boy squats on cupcakes. (Ex6, Disc 2, 00:56-01:22.) Then, for over one hour, the same boy once again squats on chicken parts and cupcakes, placed variously on a basketball, bicycle seat, and stool, his legs spread wide open and the material shown entering his buttocks, after which he blows kisses toward the cameraman. (*Ibid.*, 01:30-1:06:28.) The disc also contains 12 minutes of previews of some of the movies summarized above and similar movies. (Ex6, Disc 2, "Bonus Features.")

Of the 380 images in the bonus photo collection, most depict scenes from Disc 1 where the boy is squatting on cupcakes, with the camera frame nearly always centered on his penis and buttocks, and with some fairly close shots of both areas. (Ex7; Ex7A.)

**(6)     Count 6: "Raw Rewind Vol. 2"**

This title consists of two discs with run times of 89 and 79 minutes. (Ex8; 1:426-427,570; 2:424.) As before, no adults are visible, there is no discernable plot, the boys speak in a foreign language (Russian according to the DVD cover) without subtitles, their penises are nearly always in the center of the camera frame, and their conduct is seemingly random except that it appears designed to highlight their genitals. (*Ibid.*)

Disc 1. After some movie highlights, the first scene on this disc focuses on a prepubescent boy and two boys in their early-mid teens. (Ex8, Disc 1, 00:56-59:30.) Soon after the film begins, the boys strip naked and then move endlessly in and out of a small pool and steam bath and under a shower, with the camera frame generally centering on their penises except when they are under water. (*Ibid.*) For variety, the boys lounge on chairs with their penises prominently displayed and hit each other with towels. (*Ibid.*, 22:50-24:47, 48:50-50:00.) In the second scene, three new boys (one early-pubescent and the others in their early-mid teens) do essentially the same things in the same setting, minus the towels. (*Ibid.*, 59:30-1:28:42.)

Disc 2. In the first scene on this disc, the same three boys continue doing the same things. (Ex8, Disc 2, 00:56-26:46.) In the second scene, five new boys (three prepubescent and two in their early-mid teens) do essentially the same things in the same setting. (*Ibid*., 26:46-1:19:16.) The disc also contains a further 79 minutes of "bonus features," but these appear to be a mélange of movies already found on the two discs. (Ex8, Disc 2, "Bonus Features.")

### (7) Count 7: "Raw Rewind Vol. 1"; "FKK Ranch Party Games"; "Scenes from Crimea Vol. 1"

**"Raw Rewind Vol 1."** This title consists of two discs with run times of 84 and 81 minutes, plus four minutes of "bonus features." The material is virtually identical in terms of setting and content as "Raw Rewind Vol. 2," except that, if anything, there is an even greater focus on very young boys and on fairly close shots of penises. (Ex9; 1:427-428,570-571,573; 2:425.) The only notable difference is that the "bonus" segment consists of three nude boys being interviewed on a couch with their penises prominently displayed, and the dialogue here is subtitled. (Ex9, Disc 2, "Bonus Features.")

**"FKK Ranch Party Games."** This title consists of two discs with run times of 80 and 34 minutes, plus other material. (Ex10; 1:428-

429,571; 2:426.) The main movie on the first disc features three prepubescent boys and one early-pubescent boy who are fully nude for most of the film and who speak in a foreign language (Romanian according to the DVD cover). (Ex10, Disc 1.) After highlights focusing on the full frontal nudity of the boys, the opening scene shows two of the boys lathering each other in a shower, with the camera directed mainly at their penises. (Ex10, Disc 1, 00:55-11:30.) For much of the movie, the four boys cavort naked in a tarp-enclosed area, climbing on a tire and on a mattress, and brandishing sticks and other objects, with the camera frame usually centered on jiggling penises and occasionally on exposed anuses as the boys do flips and handstands. (*Ibid.*, 17:00-1:00:36.) They are then interviewed (with subtitles) as they sit and stand naked near an above-ground pool. (*Ibid.*, 1:00:36-1:20:18.) An accompanying "slideshow" focuses very plainly on their penises as they stand in a shower and sit on a mattress. (*Ibid.*, "Slideshow.") And for about 25 minutes of "bonus footage," the four boys wrestle naked on a mattress, in a sexually suggestive way, occasionally tying and hitting each other with straps. (*Ibid.*, "Bonus Footage.") In the second disc, the same four

boys play ping pong naked, after which two of them shower together in a scene clearly meant to showcase their penises. (Ex10, Disc 2.)

**"Scenes from Crimea Vol. 1."** This title consists of a single disc with a movie that is 100 minutes long. (Ex11; 1:429,572; 2:427.) After highlights focusing on the full frontal nudity of prepubescent boys, the opening scene shows a prepubescent boy and a boy in his early-mid teens as they strip naked in the middle of a field and ostensibly have a picnic, lounging on mats, occasionally with their legs spread for the camera. (Ex11, 00:57-9:50.) The two boys then ride in a car, where they strip nude and display their crotches. (*Ibid.*, 9:50-15:50.) Eventually they arrive at a derelict structure covered with graffiti and blow up a plastic kiddie pool, after which the younger boy strips, covers himself with oil and water, and slides around in the pool, occasionally exposing his anus. (*Ibid.*, 16:00-39:40.) The younger boy is then shown in a backyard splashing water on his naked body and spinning in a kiddie pool, with some fairly close shots of his penis. (*Ibid.*, 39:40-51:15.) The same two boys are then shown in a pool, in showers, and lounging on a couch, with the camera mainly centered on their penises and buttocks except when they are under water. (*Ibid.*, 51:15-1:40:39.)

## SUMMARY OF ARGUMENT

1.    The Supreme Court and this Court have rejected the notion that the phrase "lascivious exhibition of the genitals" is too vague to give adequate notice to a would-be offender. Silva's contrary claim fails, whether viewed as a facial or as-applied challenge.

2.    For over a century, the law has been settled that a defendant may not challenge the adequacy of the evidence presented to the grand jury. Silva's claim that the grand jury heard "no evidence" supporting Count 7 is merely a more strident way of saying that the evidence was inadequate. The claim is also: (a) based on a flawed understanding of Count 7; and (b) incorrect as a factual matter. Moreover, any error in the prior grand jury proceeding was rendered harmless when Silva subsequently received a full and fair trial and the petit jury convicted him on Count 7 beyond a reasonable doubt.

3.    There was no abuse of discretion in the exclusion of Professor Leo's proposed testimony. The district court supportably found that: (a) there was no need for summary witness testimony concerning the DVDs because the jury could simply watch them in open court, as it ultimately did; and (b) in any event, Leo would be incapable

-24-

of summarizing the many images in the DVDs given the rambling nature of his hearing testimony. The court was also justified in finding that Leo's proposed "expert" witness testimony, expressing a view that none of the images was pornographic, would not assist the jury and was downright confusing. Any error was harmless in any event.

4.　　The first contested jury charge was not an improper comment on Silva's testimony but was rather a neutral instruction that became necessary when he repeatedly suggested he could be acquitted based on a mistake of law. The second contested charge, that the jury could consider the "interest" of "witnesses," was aimed at witnesses generally and not solely at Silva. Moreover, neither of these subtle phrasing issues could have altered the outcome.

5.　　If the Court reads the count-by-count and scene-by-scene summary of the DVDs (*supra* 8-23), and if it views the most troubling segments cited in that summary, it should readily conclude that a rational jury could have found, as to each count, that there were innumerable images depicting lascivious display of the genitals. Moreover, for purposes of Counts 1-6, there was ample proof that Silva knew the DVDs he was receiving from Azov contained such images.

# ARGUMENT

## I.    The Vagueness Claim is Foreclosed and Meritless

As Silva notes (Br. 2), he framed his due process vagueness claim below as an as-applied challenge. (Docket Nos. 38, 46, 48; 1:128-137.) In substance, however, it looked more like a facial challenge. (*Ibid*.) The district court rejected the claim without drawing a distinction. (GA:14.) On appeal, Silva abandons the as-applied theory in favor of a facial attack. (Br. 12-19.) The government assumes *arguendo* that the claim is preserved and that review is *de novo. United States v. Zhen Zhou Wu*, 711 F.3d 1, 11-12 (1st Cir.), *cert. denied*, 134 S. Ct. 365 (2013).

The statutes of conviction prohibit the receipt and possession of images of minors "engaging in sexually explicit conduct," 18 U.S.C. §§ 2252(a)(2)(A), 2252(a)(4)(B)(i), a phrase that is defined to include sexual intercourse and other sexual acts as well as "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).

Over twenty years ago, the Supreme Court summarily rejected the notion that this definition is vague: "Respondents argue that § 2256 is unconstitutionally vague and overbroad . . . because Congress [in a 1984 amendment] replaced the term 'lewd' with the term 'lascivious' in

defining illegal exhibition of the genitals of children. *We regard these claims as insubstantial and reject them* for the reasons stated by the Court of Appeals in its opinion in this case." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78-79 (1994) (emphasis added). In so holding, the Court adopted the Ninth Circuit's view that the logic of two earlier opinions blessing the phrase "lewd exhibition of the genitals," *see New York v. Ferber*, 458 U.S. 747, 765, 773-74 (1982), *Miller v. California*, 413 U.S. 15, 25-26 (1973), applied equally to the phrase "lascivious exhibition of the genitals." *See United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1288 (9th Cir. 1992); *United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987); *see also United States v. Williams*, 553 U.S. 285, 296 (2008) ("the definition of 'sexually explicit conduct' . . . is very similar to the definition of 'sexual conduct' in the New York statute we upheld against an overbreadth challenge in *Ferber*").

The mere fact that the Supreme Court's rejection of the vagueness claim was "short and simple" (Br. 15), and that it relied on the Ninth Circuit's reasoning, does not make this portion of the opinion dictum. Moreover, the Court did not indicate it was retreating from this holding

when it examined the terms "patently offensive" and "indecent" in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997).

If that were not enough, in reversing an exclusion of photographic evidence, this Court agreed with the consensus that "lascivious" is a "'commonsensical term'" that juries are capable of applying in evaluating images, and that it provides would-be offenders with adequate "notice of what is permissible and what is impermissible." *United States v. Frabizio*, 459 F.3d 80, 85 (1st Cir. 2006); *accord United States v. Price*, 775 F.3d 828, 840 (7th Cir. 2014); *United States v. Rivera*, 546 F.3d 245, 252 (2d Cir. 2008). This statement was integral to the Court's holding, and was not dictum.

In light of *X-Citement Video* and *Frabizio*, any *facial* challenge to the statute is foreclosed, even if Silva has standing to mount such a challenge. *See generally National Organization for Marriage, Inc. v. McKee*, 669 F.3d 34, 41-42, 45 (1st Cir. 2012) (discussing standing). Silva cites no case to the contrary.

To the extent Silva may later suggest that this commonsensical term becomes unconstitutionally vague when applied to his particular

-28-

conduct, that claim is waived, assuming it was developed below. *United States v. Santiago*, 775 F.3d 104, 108 (1st Cir. 2014).

Such a claim would fail in any event. As described earlier (*supra* 8-23), and as argued below (*infra* 57-61), the video and photo DVDs in this case focus almost exclusively on very young boys who appear fully nude throughout the vast majority of the film segments and in nearly every still photo, and they contain numerous scenes whose only evident purpose is the lascivious display of the genitals. The DVDs fall well within the heartland of the statutory definition. Thus, Silva is not being "'held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir. 2003) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)); *see also United States v. Wolf*, 890 F.2d 241, 242-47 (10th Cir. 1989) (rejecting as-applied challenge to section 2256 where photos showed partially nude girl sleeping on bed with legs spread apart, and collecting cases).

## II.   The Grand Jury Claim Fails

### A.   Introduction and standard of review

Silva moved to dismiss the indictment on the ground that inadequate evidence was presented to the grand jury on all counts. (Docket Nos. 36, 50; 1:142-146,149-152.) The district court rejected his claim. (GA:15-16,21.) On appeal, he wisely abandons any challenge to Counts 1-6 and argues only that Count 7 should have been dismissed because (according to him) there was utterly no evidence for the grand jury to indict on that count. (Br. 20-26.)

This Court reviews legal conclusions *de novo*, *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011), fact findings for clear error, *United States v. Doe*, 741 F.3d 217, 226 (1st Cir. 2013), and refusals to dismiss indictments for an abuse of discretion, *id*.

There was no error or abuse of any kind. Moreover, any flaw in the earlier grand jury proceeding was rendered harmless when the petit jury found Silva guilty on Count 7 beyond a reasonable doubt.

### B.   The claim is foreclosed

Silva has never alleged that the government deliberately refrained from presenting adequate evidence on Count 7. Nor has he accused the

government of other intentional misconduct. Likewise, he has not claimed that the grand jury was biased or illegally constituted. And he has never faulted the indictment as *facially* invalid.

Instead, Silva simply says there was no evidence to support Count 7. As now explained, his "no evidence" theory is foreclosed. And as discussed further below, the theory also fails as a factual matter.

In an opinion by Justice Holmes, the Supreme Court refused to dismiss an indictment where the prosecutor presented "very little evidence against the accused" to the grand jury apart from statements deemed to be "incompetent." *Holt v. United States*, 218 U.S. 245, 247 (1910). The Court reasoned: "The abuses of criminal practice would be enhanced if indictments could be upset on such a ground." *Id*. at 248.

Relying in part on *Holt*, in 1956 the Supreme Court held that prosecutors may rely entirely on hearsay in seeking an indictment. *Costello v. United States*, 350 U.S. 359, 362-64 (1956). Despite the narrowness of the issue presented, the Court adopted a broad rationale for this result, reflected in the two underscored passages below:

> If indictments were to be held open to challenge on the ground that there was *inadequate or incompetent* evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial

on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. *An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.* The Fifth Amendment requires nothing more.

*Id.* at 363 (emphasis added, footnote omitted). In support of this sweeping rule, the Court quoted an 1852 opinion: "'No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon *sufficient proof* . . . .'" *Id.* at 362-63 (emphasis added). The Court said that "permitting defendants to challenge indictments on the ground that they are not supported by *adequate or competent* evidence" would only result in unjustifiable delays and would "add nothing to the assurance of a fair trial." *Id.* at 364 (emphasis added).

Since *Costello*, the Supreme Court has consistently adhered to the quoted passages in rejecting other efforts to dismiss indictments based on alleged flaws or omissions in the evidence presented to grand juries. *See, e.g.*, *Lawn v. United States*, 355 U.S. 339, 349-50 (1958) (evidence

obtained in violation of Fifth Amendment privilege against self-incrimination); *United States v. Calandra*, 414 U.S. 338, 344-45 (1974) (evidence from illegal search and seizure); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 260-61 (1988) (agent summaries that were allegedly inaccurate and based on evidence that was never presented to grand jury); *United States v. Williams*, 504 U.S. 36, 53-55 (1992) (exculpatory evidence withheld from grand jury).

In the second of these cases, for example, the Supreme Court reiterated that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of *inadequate or incompetent* evidence." *Calandra*, 414 U.S. at 345 (emphasis added). And in the last of these cases, the Court summarized its case law as holding that courts must "abstain from reviewing the *evidentiary support* for the grand jury's judgment . . . ." *Williams*, 504 U.S. at 54 (emphasis added).[3]

---

[3] This Court has rejected the theory that, because *Costello*, *Lawn* and *Calandra* concerned "the *character* of the evidence upon which a grand jury can base an indictment . . . rather than the *quantum* of evidence before the grand jury," the Supreme Court's use of the word "inadequate" in these decisions can be dismissed as dictum. *Woodstock v. Amaral*, 511 F.2d 985, 993 (1st Cir. 1974) (emphasis added).

Recently the Supreme Court reaffirmed *Costello's* core principles in holding that a defendant may not challenge a grand jury's probable cause determination in opposing the pre-trial freezing of alleged forfeitable assets. *Kaley v. United States*, 134 S. Ct. 1090, 1097-1100 & n.10 (2014). After noting the rule that a facially valid indictment issued by a properly convened grand jury "conclusively" establishes probable cause, the Court explained: "And 'conclusively' has meant, case in and case out, just that. We have found no 'authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof.'" *Id*. at 1097 (quoting *Costello*, 350 U.S. at 362-63); *see also id*. at 1100 n.10. The Court summed up with unconditional language: "The grand jury gets to say – without any review, oversight, or second-guessing – whether probable cause exists to think that a person committed a crime." *Id*. at 1098. And the Court said this blanket rule is justified even though the grand jury's decision alone may trigger deprivations of liberty and property. *Id*. at 1098-99.

Silva seeks to avoid these precedents by claiming there was utterly no evidence presented as to Count 7. But the Supreme Court has

-34-

precluded review into "the adequacy of the evidence before the grand jury," *Costello*, 350 U.S. at 409, or "the evidentiary support for the grand jury's judgment," *Williams*, 504 U.S. at 54, while making plain that its probable cause finding is "conclusive" in the broadest possible sense of the word, *Kaley*, 134 S. Ct. at 1097-98. A "no evidence" claim is merely a more strident challenge to the evidentiary "adequacy" and "support" for a particular charge. Thus, there is simply no room for such claims in light of this case law.

Even assuming *arguendo* that the Supreme Court has left open the possibility of a "no evidence" claim, the issue appears to be foreclosed in this circuit. In 1989 this Court noted that, absent a claim of prosecutorial misconduct (in that case an allegation that the prosecutor presented perjured testimony to the grand jury), "[a] court should not inquire into the sufficiency of the evidence before the indicting grand jury," relying in part on *Costello*. *United States v. Maceo*, 873 F.2d 1, 3 (1st Cir. 1989). Later that year, it found that it was unnecessary to address whether a "no evidence" theory was viable because the claim had been waived. *United States v. Mack*, 892 F.2d 134, 135-36 (1st Cir. 1989) (noting apparent circuit split).

In 2007, however, the Court affirmed the denial of a request for grand jury transcripts where a defendant had sought "to show that 'no evidence,' as opposed to 'insufficient evidence,' was presented to support the 'affecting commerce' element of the Hobbs Act charges." *United States v. Capozzi*, 486 F.3d 711, 727 (1st Cir. 2007). The Court rejected a jurisdictional theory while equating a "no evidence" claim with a "challenge to the sufficiency of the evidence before the grand jury." *Id.* In other words, the Court saw no difference between a claim of inadequate evidence and a claim of no evidence. *Id.*

In 2011, the Court cited *Costello* in affirming the denial of a pre-trial motion to dismiss an indictment where the defendant had claimed the government "produced no *evidence* during discovery that his acts had affected interstate commerce, leaving [it] unable to satisfy the [Hobbs] Act's jurisdictional prerequisite." *Guerrier*, 669 F.3d at 3-4 (emphasis in original). The Court viewed this as an indirect claim that the government had presented no evidence to the grand jury on this element, and it rejected the notion that dismissal was required on that ground. *Id.*; *see also United States v. Casas*, 425 F.3d 23, 38 (1st Cir. 2005) (citing *Calandra* in stating that "we will not inquire into Casas's

claim that there was insufficient evidence before the grand jury of his participation in the overt acts listed in the indictment" and that "[a] grand jury proceeding is not a trial; only after conviction following a trial is sufficiency of the evidence an appropriate issue.").

Even if it is still open to debate whether a defendant may pursue a "no evidence" claim, the Court should hold that such claims may not be maintained. There are five main points.

First, if existing precedent does not bar "no evidence" claims, at the very least it casts a long shadow over them. Silva points to a concurring opinion in *Costello* (Br. 24-25), in which Justice Burton stated that "if it is shown that the grand jury had before it no substantial or rationally persuasive evidence upon which to base its indictment, that indictment should be quashed." *Costello*, 350 U.S. at 364 (Burton, J., concurring). As several courts have noted, however, no other justice has subscribed to this view. *See United States v. Mills*, 995 F.2d 480, 487-88 (4th Cir. 1993); *United States v. Alexander*, 789 F.2d 1046, 1048 (4th Cir. 1986); *United States v. Short*, 671 F.2d 178, 182 n.2 (6th Cir. 1982). And Justice Burton's remarks are in direct conflict with the broad rule of *Costello* itself, which has been reaffirmed repeatedly.

Second, decisions from other circuits undercut the notion that a "no evidence" theory survives the *Costello*-related Supreme Court precedents discussed above. *See United States v. Riley*, 292 Fed. Appx. 717, 722 (10th Cir. 2008) (unpublished) (holding that a "no evidence" claim was barred by *Costello*); *Short*, 671 F.2d at 181-82 (rejecting proposed rule that would allow indictment dismissal "for a complete absence of evidence"); *United States v. Cruz*, 478 F.2d 408, 412 (5th Cir. 1973) (holding, where defendant claimed indictments were not based on "any probative evidence," that "[w]e will not review the sufficiency of the evidence, if any, supporting the grand jury indictments in this case."); *see also United States v. Powell*, 823 F.2d 996, 1000-01 (6th Cir. 1987) (noting *Short* holding); *United States v. Roth*, 777 F.2d 1200, 1203-06 (7th Cir. 1985) (Posner, J.) (questioning whether a sufficiency claim could ever be viable absent a showing of outrageous government misconduct such as the intentional presentation of perjured testimony to the grand jury); *but see United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir. 1985) (implying indictment may be dismissed on a "no evidence" theory but rejecting that claim on the facts); *United States v. Romero*, 585 F.2d 391, 399 (9th Cir. 1978) (agreeing that a "complete

absence of evidence might serve to invalidate an indictment" but finding this standard was not met).

Third, "no evidence" claims pose the same dangers of delays and mini-trials as "inadequate evidence" claims, and they are just as likely to generate discovery litigation. Such litigation, in turn, would threaten to compromise the secrecy of grand jury deliberations in cases where the underlying material sought would not otherwise be discoverable. *See generally Capozzi*, 486 F.3d at 727. Here, it just so happens that the key grand jury transcript was disclosed to the defense because it covers the testimony of an agent who later testified at trial. In other cases, however, defendants pursuing "no evidence" claims can be expected to seek grand jury materials to which they would not normally have access.

Fourth, a "no evidence" exception would likely swallow the rule because defendants would always find ways to characterize modest evidence as "no" evidence. This case illustrates the point. As discussed below, it cannot be said that there was "no" evidence here, yet Silva has packaged his claim that way in an effort to skirt the rule that a grand jury's probable cause finding is immune from review.

Fifth, the line between "inadequate" and "no" evidence is elusive at best and it would be difficult to police. At what point would we say that evidence crosses the line from merely inadequate to sufficiently non-existent? Would a defendant be entitled to discovery merely by asserting that there was "no" evidence? And how would a judge even make the initial "inadequate" versus "no" call without engaging in a more general review of the adequacy of the grand jury's decision – the very sort of review that the Supreme Court has prohibited?

### C.    This is not a "no evidence" case

In any event, even if a defendant may open up the grand jury's probable cause determination for review by making a "no evidence" allegation, Silva's claim here fails on the facts for two separate reasons.

First, the claim is premised on a misunderstanding of Count 7. As presented to the grand jury, Count 7 was broadly framed. It charged that between April 2010 and September 27, 2012, Silva "did knowingly possess *one or more matters* which contained a visual depiction" of child pornography; it did not limit the charge to specific DVDs. (1:18) (emphasis added). The grand jury had *overwhelming* evidence that he possessed "one or more" such "matters" in this period. (1:191-237.)

-40-

It is true that when Silva later moved for a bill of particulars (Docket No. 31), the government elected to rely on three specific DVDs in support of Count 7, while also adding still-photo DVDs as further support for two of the receipt counts (Docket Nos. 39, 39-1). But Silva has never argued that the government was procedurally barred from narrowing and clarifying Count 7 in this manner following the grand jury's true-bill decision, without returning to the grand jury for a superseding indictment, so it is unclear why his sufficiency claim should be judged by reference to the subsequently-reframed Count 7 instead of by reference to the charge that was actually presented to the grand jurors for their consideration. Because there was ample evidence to support the original charge that the grand jurors voted on, the "no evidence" theory necessarily fails. It also follows that this case is light years away from the alarming scenario of a prosecutor persuading a grand jury to indict on a mere whim, without any cause.

Second, even if the reframed Count 7 were the proper benchmark, it cannot be said that there was "no" evidence Silva possessed the three DVDs in question. The grand jury heard evidence that Silva received and possessed dozens of Azov-related videos and that Azov specialized

in nude boys displaying their genitals in a lascivious manner. (1:195-226.) The three DVDs undergirding the reframed Count 7 all fall into this same category, though they were not referred to by title or content in the grand jury. (*Supra* 21-23.) Moreover, the grand jury heard evidence concerning a DVD titled "Raw Rewind Vol. 2," on which Count 6 was based. (1:219-220.) One of the three DVDs underlying the reframed Count 7 is "Raw Rewind Vol. 1," part of the same series. (*Supra* 21.) Even assuming these facts fall short of establishing probable cause to believe that Silva possessed the three DVDs, they rebut any suggestion that there was "no" evidence on point.

### D.   *Mechanik* renders any error harmless

Assuming *arguendo* that a "no evidence" claim may be maintained and that Silva has satisfied whatever burden he may have on that score as to Count 7, any error was plainly harmless.

Faced with a Fed. R. Crim. P. 6 violation, where the error may have affected the grand jury's charging decision, the Supreme Court observed: "But the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a

reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986). Given this stark reality, the Court held: "Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.*

The *Mechanik* Court explained that this result was justified even though the grand and petit juries likely considered different evidence:

> It might be argued in some literal sense that because the Rule was designed to protect against an erroneous charging decision by the grand jury, the indictment should not be compared to the evidence produced by the Government at trial, but to the evidence produced before the grand jury. But even if this argument were accepted, there is no simple way after the verdict to restore the defendant to the position in which he would have been had the indictment been dismissed before trial. He will already have suffered whatever inconvenience, expense, and opprobrium that a proper indictment may have spared him. In courtroom proceedings as elsewhere, "the moving finger writes; and, having writ, moves on." Thus reversal of a conviction after a trial free from reversible error cannot restore to the defendant whatever benefit might have accrued to him from a trial on an indictment returned in conformity with Rule 6(d).

*Mechanik*, 475 U.S. at 71. After listing the "societal costs" of reversal, the Court found that these costs "are far too substantial to justify setting aside the verdict simply because of an error in the earlier grand jury proceedings." *Id.* at 71-73.

-43-

Based on *Mechanik*, this Court has held that "all but the most serious errors before the grand jury are rendered harmless by a conviction at trial," and that "[o]nly a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment is sufficient to invalidate a subsequent conviction." *Casas*, 425 F.3d at 37 (internal quotation marks omitted); *accord Goodrich v. Hall*, 448 F.3d 45, 49-50 (1st Cir. 2006); *United States v. Brennick*, 405 F.3d 96, 98-99 (1st Cir. 2005).

Here, Silva received a full and fair trial, after which the petit jury found him guilty beyond a reasonable doubt on Count 7. (2:528.) Thus, even assuming *arguendo* that there was an error in the prior grand jury proceeding, any such error was harmless. *See, e.g.*, *United States v. Stradwick*, 46 F.3d 1129, 1995 WL 20672, *1 (4th Cir. 1995) (per curiam) (unpublished) ("Because Smith was convicted at trial of the gun charge by evidence beyond a reasonable doubt, we find that any deficiency in the evidence before the grand jury, including an alleged complete lack of evidence, is not a sufficient basis for reversing the conviction."); *Mills*, 995 F.2d at 487-90 (suggesting district court may dismiss indictment for lack of evidence prior to trial, but holding

subsequent jury verdict adequately protects a defendant's rights under the Fifth Amendment's Indictment Clause even in that situation).

## III.   Exclusion of Leo's Testimony was Not Reversible Error

### A.     There was no abuse of discretion

Silva offered the testimony of retired University of Rhode Island English professor John Leo primarily for two reasons, as reflected in written proffers, Leo's pre-trial hearing testimony, and defense arguments: (1) to summarize the content of all the charged DVDs; and (2) to opine that none of the images in them constituted "lascivious exhibition of the genitals" based on his own personal assessment. (Docket Nos. 53, 61; 1:26-89,94-112,119-121,157-190.) The government opposed the motion *in limine*. (Docket No. 59; 1:112-119.)

After Leo's hearing testimony, and on the heels of some skeptical questioning of defense counsel (1:94-111), the district court denied the motion (GA:8-13). As to the first defense point, the court found that the jury could conveniently watch the DVDs in court, and that in any event Leo would not "be an adequate summary witness" because there was "not any chance that he would be capable of succinctly presenting

what's in those videos." (GA:8-9.) The court elaborated: "He was rambling and unfocused, talking about one video and another video, and he was all over the place." (GA:9.) As to the second defense point, the court explained at length why the proposed testimony would not be helpful to the jury and why some of it was "very vague" and confusing. (GA:9-12.)

Silva now argues these judgment calls were in error. (Br. 26-41.) Review is for an abuse of discretion. *United States v. Tetioukhine*, 725 F.3d 1, 6 (1st Cir. 2013). There was no such abuse here.

Expert testimony must satisfy certain criteria to be admissible. *See* Fed. R. Evid. 702. A key threshold requirement is that it must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *United States v. Mehanna*, 735 F.3d 32, 66-67 (1st Cir. 2013), *cert. denied*, 135 S. Ct. 49 (2014). And even if the proffered evidence satisfies all the elements of Rule 702, it may still be excluded if it has the potential to confuse or mislead the jury. *See* Fed. R. Evid. 403; *Tetioukhine*, 725 F.3d at 6; *United States v. Jones*, 689 F.3d 12, 18-20 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1278 (2013); *United States v. Pires*, 642 F.3d 1, 10-12 (1st Cir. 2011).

Silva confronts a threshold problem in any effort to argue that the district court had no choice but to admit Leo's proposed testimony: As the court noted several times (1:94,107,126), this Court has held that the word "lascivious" is a "'commonsensical term'" that juries should have no trouble in applying in evaluating charged images. *Frabizio*, 459 F.3d at 85. It follows, the Court said, that "expert testimony is *not required* on the subject" although there is "no general rule that it is prohibited." *Id.* 85 n.8 (emphasis added). In support, the Court cited a Ninth Circuit decision stating that "[t]here is a consensus among the courts that whether the item to be judged is lewd, lascivious, or obscene is a determination that lay persons can and should make." *United States v. Arvin*, 900 F.2d 1385, 1390 (9th Cir. 1990); *see also United States v. Russell*, 662 F.3d 831, 848-50 (7th Cir. 2011). Given this state of the law, Silva faces a steep climb in his effort to establish that the district court was *required* to admit this particular testimony.

Beyond this, even a casual review of Leo's testimony (1:28-89) reveals why the district court found that it was unhelpful, confusing, and vague, and why: (1) Leo had no expertise that could help the jury evaluate the intent of the producer or of a purchaser (GA:9-10); (2) Leo

could not help the jury fit the DVDs into the context of a particular film genre such as nudism (GA:10); (3) the jury was perfectly capable of deciding such matters as whether (a) the images focused on the genitals, (b) the settings were sexually suggestive, and (c) the boys' poses were unnatural (GA:11-12); and (4) Leo relied mainly on "his ipse dixit opinions that these are not sexualized images or evoke sexual connotations because he says they aren't, and that's not what [Rule] 702 allows" (GA:11-12).

Although Silva ably recounts the proposed testimony in a defense-favorable light (Br. 30-35), his summary, even if accepted at face value, would not warrant overturning the district court's ruling as an abuse of discretion. Moreover, the main case on which he relies, *United States v. Alzanki*, 54 F.3d 994, 1005 (1st Cir. 1995), is of no help since it merely upheld a ruling *admitting* expert testimony. Silva cites no case where an exclusion led to reversal, let alone a case with comparable facts.

The summary witness rationale is even weaker. Rule 1006 allows summary witness testimony concerning various media "that cannot be conveniently examined in court." Fed. R. Evid. 1006. Here, the jury had no trouble watching the DVDs in open court, sometimes at high speed.

(*Supra* 8-23.) In any event, there is no basis for overturning the district court's alternative finding (GA:8-9) that Leo was incapable of giving a coherent summary of all of the scenes and photos in each DVD. Silva offers no meaningful challenge to that aspect of the ruling; indeed, he all but concedes that the court had a valid point here. (Br. 41.)

### B.   Any error was harmless

Because Silva raises non-constitutional evidentiary issues, any error was harmless so long as it is "highly probable" that it did not alter the verdict. *United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011). The alleged error was harmless under any standard, however, for three main reasons. *See, e.g.*, *United States v. Torres-Rosario*, 658 F.3d 110, 114-15 (1st Cir. 2011) (exclusion of evidence harmless "by any standard"); *United States v. Guzman*, 603 F.3d 99, 107-08 (1st Cir. 2010) (exclusion of evidence harmless); *United States v. Catalán-Roman*, 585 F.3d 453, 470-71 (1st Cir. 2009) (exclusion of evidence harmless even if defendant received benefit of the constitutional harmless error standard); *United States v. Pridgen*, 518 F.3d 87, 91-93 (1st Cir. 2008) (same).

First, as the district court pointed out (GA:8-13), Leo's proposed testimony (1:28-89) was unhelpful, it was confusing and rambling in places, and it was not a useful substitute for watching the DVDs. It likely would have left the jurors mystified.

Second, in his own arguments to the jury, defense counsel was able to make many of the points that Leo would have made in his proposed testimony, simply by pointing to various aspects of the films. (2:221-243.) Indeed, the testimony was little more than a thinly-disguised jury argument to begin with, and a bad one at that. It would not have enabled Silva to avoid conviction.

And third, the evidence summarized above (*supra* 8-23) and discussed below (*infra* 57-61), overwhelmingly established that the DVDs contained countless pornographic images. The jury's speedy verdict reflects that it did not see any close calls here. (2:251-257,527-528.) There is no chance Leo's testimony would have altered the outcome.

## IV.    There was No Error in the Jury Instruction Phrasing

### A.    Introduction and standard of review

Silva renews two of his objections to the jury instructions. (Br. 52-58.) The standard of review is settled: "In evaluating preserved claims of instructional error, we consider *de novo* whether an instruction properly conveyed the governing law, and we review for abuse of discretion the district court's choice of language to present that law." *United States v. Ramos-González*, 775 F.3d 483, 496-97 (1st Cir. 2015). Because Silva's two claims focus on phrasing issues, review is for an abuse of discretion. There was no such abuse.

### B.    The first instruction claim is meritless

Though noting that Congress expressed itself ungrammatically, the Supreme Court held that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers." *X-Citement Video*, 513 U.S. at 472. On the first point, the Court said that the legislative history "persuasively indicates that Congress intended that the term 'knowingly' apply to the requirement that the depiction be of sexually explicit conduct . . . ." *Id.* at 471.

Consistent with *X-Citement Video*, the district court instructed the jury without objection that the government had to prove beyond a reasonable doubt that Silva "knew" the charged "visual depictions" were of minors engaged in "sexually explicit conduct," a term which in this case meant "lascivious exhibition of the genitals." (2:172,174,176.) The court defined the knowledge element (2:172-173), listed factors for the jury to consider in assessing whether the images depicted "lascivious exhibition of the genitals" (2:174-175), and warned that "nudity alone is not enough to make an image child pornography" (2:174). Thus, the court clearly required the jury to find that Silva himself *knew* that the images in question depicted "lascivious exhibition of the genitals" as opposed to mere nudity. (2:172-176.) Silva does not claim otherwise.

Silva nonetheless complains (Br. 54-55) that the district court erred in inserting the following caveat after defining "knowledge": "It is for you, the jury, to decide whether the material received and possessed by the Defendant meets the definition of sexually explicit conduct. If the Defendant incorrectly believed what does and does not constitute child pornography, that does not relieve him of responsibility as long as the Government has proven the elements that I've outlined above." (2:173.)

As the district court noted (2:151-163), this was not an improper comment on Silva's testimony but was rather a neutral instruction that became necessary when he repeatedly suggested he could be acquitted based on a mistake of law. The court was just saying that it was no defense that Silva may have been unaware of the correct legal standard (*i.e.*, "lascivious exhibition of the genitals") or may have incorrectly believed that a different legal standard applied. And in the same breath, the court made clear that an incorrect belief concerning the law was no defense "as long as the Government has proven the elements that I've outlined above" (2:173), effectively reminding the jury that the burden of proof remained with the government to show knowledge.

The instructions merely reflect the settled rule that ignorance of the law is no defense. Under this rule, "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998) (footnote omitted). The instructions here clearly required such proof, and Silva does not dispute this point.

In fact, the instructions may have overstated the government's burden. *See United States v. Williams*, 553 U.S. 285, 301 (2008) (under

18 U.S.C. § 2256, a "defendant must believe the picture contains certain material, and that material in fact (and not merely in his estimation) must meet the statutory definition [of 'lascivious']"); *Hamling v. United States*, 418 U.S. 87, 119-125 (1974) (rejecting claim that 18 U.S.C. § 1461 requires proof that defendant "knew the materials mailed were obscene," upholding instruction that "'belief as to the obscenity or non-obscenity of the material is irrelevant,'" stating that evidence must merely show defendant "had knowledge of the contents of the materials" and "knew the character and nature of the materials," and reasoning that "[t]o require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law," and that "[s]uch a formulation of the scienter requirement is required neither by the language of [§ 1461] nor by the Constitution.").

The mere fact that the district court referred to Silva in setting forth the instruction was not error. This is because trial judges have "the power to 'analyze, dissect, explain, summarize, and comment on the evidence,' so long as their participation is balanced, and does not render unfair advantage to either party." *United States v. Valdivia*, 680

F.3d 33, 42-44 (1st Cir. 2012). Here, the court did not even exercise the full extent of this power; it simply referred to Silva as the defendant in the course of an otherwise correct and neutral statement of the law. There was no abuse of discretion in this phrasing. *See, e.g.*, *Valdivia*, 680 F.3d at 42-44 (no error, although judge's instructions referred to facts of case and arguably suggested judge believed case was strong); *United States v. Sabetta*, 373 F.3d 75, 80-81 (1st Cir. 2004) (though "not ideal," instruction did not impermissibly comment on facts of case even though judge used scenario from the actual case to illustrate point); *United States v. Maguire*, 918 F.2d 254, 268-69 (1st Cir. 1990) (no error, where judge's instructions referred extensively to facts of case and the defendants).

In any event, given the surrounding instructions that accurately set forth the elements of the offenses and the government's heavy burden, the strength of the evidence against Silva, and the speed with which the jury reached its decision, there is no reason to think that this isolated issue of phraseology altered the verdict. *See Ramos-González*, 775 F.3d at 497 ("Even an incorrect instruction will not warrant reversal if it was harmless.").

### C.    The second jury instruction claim is meritless

The second claim has even less traction. In reciting factors to consider in weighing "the testimony of witnesses" (2:180-183), the district court said the jury could assess the interest of "the witness" in the outcome of the case (2:181). Contrary to Silva's weak suggestions (Br. 56-58), the court plainly was not singling him out as the lone witness to whom the instruction applied. The instruction applied generically to witnesses. Moreover, Silva is incorrect in stating that the jury must have viewed the instruction as applying solely to him because he was the only witness who had an interest in the outcome. (Br. 56.) The law enforcement witnesses could equally be seen as having such an interest. Finally, the idea that this isolated snippet from the charge altered the verdict is farfetched.

## V.    The Evidence was More than Sufficient

### A.    There were countless pornographic images

Silva renews his claim that the DVD videos and still photos were not pornographic. (Br. 43-48.) As the undisputed jury instructions reflect, the government was only required to prove as to each count that Silva knowingly received or possessed at least one pornographic image, not that every portion of each disc was pornographic. (2:170-171,176-178.) Thus, the question on appeal is whether, viewing the DVD videos and photos underlying each count in the light most favorable to the verdict, a rational jury could have found that at least one specific scene or image involved lascivious exhibition of the genitals. *See generally United States v. Almeida*, 748 F.3d 41, 52 (1st Cir. 2014).

The government has already described the charged DVD videos and photos on a count-by-count and scene-by-scene basis. (*Supra* 8-23.) Suffice it to say that, whether considered under the *Dost* criteria or other metrics, most of the film scenes and nearly all of the photos depict lascivious exhibition of the genitals or pubic area.[4] If anything, the

---

[4] The parties asked for instructions on the *Dost* factors (Docket Nos. 64, 68), and the court complied, while warning that the factors are non-binding and not comprehensive (2:174-175). This Court has gone so far

district court's *Dost*-centered analysis (GA:3-4) was too charitable. And Silva's contention that the films and photos are merely "a paean to naturalism and nudism" (Br. 47) borders on the absurd.

As the earlier summary (*supra* 8-23) illustrates, some key themes emerge from a close examination of the DVDs: (1) the boys are very young and often prepubescent; (2) they are fully nude in the vast majority of the scenes and photos; (3) the camera frame is often centered on penises and buttocks and sometimes there are fairly close shots of each, even though there are no zoom shots that fill the entire frame; (4) in many instances the boys' legs are spread wide open and they are clearly posing for the camera; (5) in other cases they are engaged in sexually-charged conduct, such as wrestling in a sexually suggestive way, massaging each other with oil, lathering each other in showers, and sitting on cupcakes and chicken parts in an apparent simulation of anal sex; (6) there are many bedroom and living room scenes where the boys appear naked together on beds or on mattresses

---

as to say that the factors are "problematic," *United States v. Batchu*, 724 F.3d 1, 9 (1st Cir.), *cert. denied*, 134 S. Ct. 663 (2013), and that "[t]he statutory standard needs no adornment," *Frabizio*, 459 F.3d at 85. In *Frabizio*, it criticized the factors at length and noted that they are overly generous to the defense. *Id*. at 86-90.

thrown on the floor; (7) there is no evident plot; (8) the boys speak in a foreign language, which is almost never translated; (9) there are no visible adults, no scenes of nude families or siblings, and nothing to suggest a nudist environment; (10) rather, the boys seem unrelated, and they often appear in settings where it is not natural for such boys to be naked together; and (11) in many cases the boys' conduct is seemingly random and indeed incongruous, except that it appears designed to showcase their genitals.

Some examples of the eleventh factor include fully nude boys: (1) spinning in an office chair; (2) rotating in place in a shower; (3) gyrating in an empty plastic kiddie pool covered with oil; (4) repeatedly squatting on cupcakes and chicken parts; (5) interminably lounging on a bed with legs spread wide apart; (6) aimlessly walking in and out of rooms; (7) endlessly moving in and out of pools, saunas and showers; and (8) doing pushups, sit ups, kicks and flips, evidently so that the penises can be viewed in motion and from different angles.

A rational jury easily could have found that large swaths of the videos and almost all of the photos depict lascivious exhibition of the genitals or pubic area. First Circuit decisions buttress this conclusion.

*See, e.g.*, *Batchu*, 724 F.3d at 9 (scantily clad girl with visible breasts bending over); *United States v. Wilder*, 526 F.3d 1, 12 (1st Cir. 2008) (children with legs spread apart on beds or couches, largely unclothed, and posing in sexually suggestive way); *Frabizio*, 459 F.3d at 86 (girls posing nude with legs parted "in settings . . . [that] provide no ready explanation that makes the nudity indisputably innocent"); *compare with United States v. Hilton*, 257 F.3d 50, 58 (1st Cir. 2001) (photos not lascivious where genitalia not visible and nothing sexually suggestive); *United States v. Amirault*, 173 F.3d 28, 33-35 (1st Cir. 1999) (photo of naked girl at beach standing in hole in sand not lascivious).

Extra-circuit decisions are also in accord. *See, e.g.*, *United States v. Schuster*, 706 F.3d 800, 807-08 (7th Cir. 2013) (three naked boys in bathtub and focus on genitals of one boy); *United States v. Larkin*, 629 F.3d 177, 182-84 (3d Cir. 2010) (nude girls in tub and shower, with no close-up shots of genitals, but poses and camera angles sexually suggestive); *United States v. Knox*, 32 F.3d 733, 751 (3d Cir. 1994) (genitals not even visible); *Wolf*, 890 F.2d at 242-47 (partially nude girl sleeping on bed with legs spread apart). Indeed, at least one other district court judge has ruled that certain of the Azov films at issue

here, as well as related Azov films, are pornographic. *See United States v. Downsbrough*, 2013 WL 5781570, *11-14 (E.D. Tenn. 2013) (analyzing issue in context of search and seizure question).

## B.    There was ample proof of knowledge

As he did below, Silva challenges his convictions on Counts 1-6 on the ground that there was no evidence he knew the content and character of the DVDs when he received them. (Br. 48-52.) The district court properly concluded otherwise. (GA:4-5; 1:549.)

As a threshold matter, Silva overstates the government's burden. As noted (*supra* 51-52), the district court required the jury to find that Silva knowingly received the DVDs and knew they depicted the lascivious exhibition of the genitals. (2:171-174.) Silva never asked for an instruction to the effect that the government needed to prove he was aware of the exact content of the DVDs at the precise moment he first touched the outer packaging of the mailings (Docket No. 64), and the case law undermines the notion that such proof is required. *See United States v. Ogden*, 685 F.3d 600, 603-04 (6th Cir. 2012); *United States v. Schwarte*, 645 F.3d 1022, 1031-33 (8th Cir. 2011); *United States v. Osborne*, 935 F.2d 32, 34 & n.2 (4th Cir. 1991).

Beyond this, the evidence of knowledge was more than sufficient for three main reasons:

First, Silva's own remarks indicate that he visited the Azov website before ordering the DVDs and formed an opinion that Azov was engaged in illegal conduct. In the second of three emails that he sent to his state police colleague, Silva said he had "discovered a website called AZOV" that focused on "nude boys" and appeared to have Russian ties, and that he suspected Azov might be involved in dubious activities under the cover of "naturism." (1:523; 2:429.) Silva explained that his concerns were based on several factors, including the fact that the Azov website contained a "Boy Joy" link that "goes to XXX young adult male sex films." (2:429.) Silva also said he feared Azov was "doing more with these boys than they are presenting" and that he had "a really bad feeling about what may be happening to those boys." (2:429.) In the third email, Silva told the same state police officer that the website had "disappeared," while adding: "I just hope that the Russians are not scurrying back to their home turf to re-establish themselves. I hope the authorities are all over them." (1:529; 2:431.)

Although Silva made these statements in the context of bogus efforts to portray himself as a concerned citizen who would never dream of ordering an Azov DVD, the statements support an inference that he knew he was ordering child pornography even before he received the first charged DVD. In other words, the jury could find that Silva's stated misgivings were deliberately understated, and that his guilty mindset dated back to the period when he first studied the Azov website and began ordering DVDs. (1:440-442,445.)

Silva notes that in the second email he said that the *film previews* on the website did not "appear to 'cross the line' into pornography," but that they "definitely flirt with the line." (2:429.) It stands to reason, however, that a company like Azov would not upload pornographic images to its public website; what matters is that, from Silva's own perspective at the time, the previews apparently suggested that the full-length films would be more revealing. This conclusion is reinforced by the other statements just quoted and by the fact that Silva thought the boys were "being groomed to perform in the pornographic adult films when they come of age." (2:429.)

Second, given that Silva described the Azov website in detail in his emails, and given that he placed all of his orders from that website, the jury easily could have found that he was familiar with the website's descriptions touting each of the charged DVDs. (1:352-354.) Although these summaries had to be subtle given the quasi-public nature of the website (1:315-316), several were highly suggestive (2:419-427).

For example, Azov slyly noted that: (1) in the Count 1 DVD, the "the camera awakens the boys" in the morning and they have a "cold shower," after which there is a "nudist menu" of activities, including "deep massage" scenes (2:419); (2) in the Count 2 DVD, "Vladik's naturist buddies join him in sauna and beach antics" as part of "a series of lengthy *Vladik* nudist scenes from seven of his movies . . . that will leave you wanting more" (2:420); (3) the Count 3 DVD would feature "the best *Vladik* naturist scenes," and "*Vlad* is a little older in these scenes; between 14 and 16 so true *Vlad* fans will love it" (2:421); (4) the Count 4 DVD would focus on boys who are "our on camera nudists . . . who have obviously become very comfortable with the camera" and who are under "no adult supervision," including a scene in a hotel were "*Paul* and *Calin* get into some nudist fun while *Alex* looks

-64-

on," as well as nude wrestling, and "deleted scenes" of Paul and Calin in a "private cabin" on a train ride (2:422); (5) the Count 4 still-photo collection was of "super high quality . . . nudist photos not seen before" and that were "not available for download" (2:422); (6) the Count 5 DVD featured "ooey-gooey goodness" with "Vlaviu and his buddies going commando in a very unique way" and engaging in "nudist food fighting" (2:243); (7) the Count 5 still-photo collection was of "super high quality . . . nudist photos not seen before" that were "mysterious" and "not available for download" (2:423); (8) the Count 6 DVD contained "unedited naturist raw footage" (2:424); (9) the first Count 7 DVD contained the same and focused on "two boys many feel were not seen enough" (2:425); (10) the second Count 7 DVD featured "great nudist fun in the sun," including a "deleted scene" of a "sleepover where the boys just lounge around and play some computer games and commando play fight a little bit" (2:426); and (11) the third Count 7 DVD featured "great nudist fun" with boys who were "comfortable in their surroundings and their bodies," including two boys who would "pump up and lounge in an inflatable pool" (2:427).

Third, as the district court emphasized (GA:5), the serial nature of Silva's DVD orders fatally undermines any lack of knowledge claim. It is undisputed that Silva ordered the DVDs underlying Counts 1-6 on the following dates: November 25, 2010 (Count 1); December 2, 2010 (Count 2); January 1, 2011 (Count 3); January 17, 2011 (Count 4); February 15, 2011 (Count 5); and March 25, 2011 (Count 6). (2:268,269,274,275,277,282.) With each successive purchase and receipt – some spaced weeks and even months apart from each other – the inference became stronger and stronger that he knew full well the pornographic nature of what he was ordering and receiving. So even if Silva could somehow defeat the first receipt count, there is no margin for vanquishing the remaining counts.

## CONCLUSION

For the above reasons, this Court should affirm.

Respectfully submitted,

PETER F. NERONHA
United States Attorney

/s/ Donald C. Lockhart

DONALD C. LOCKHART
Assistant U.S. Attorney

-66-

## **CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it contains 13,639 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface rule in Fed. R. App. P. 32(a)(5) and the type style rule in Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced, serif typeface (*i.e.*, Century Schoolbook) in 14-point font.

/s/ Donald C. Lockhart
_____

DONALD C. LOCKHART
Assistant U.S. Attorney
Dated:  March 4, 2015

## **CERTIFICATE OF SERVICE**

I certify that on March 4, 2015, I electronically served a copy of the foregoing filing on the following registered participants of the CM/ECF system:

Robert B. Mann, Esq.
Mann & Mitchell
One Turks Head Place, Suit 610
Providence, RI 02903

/s/ Donald C. Lockhart
_____

-67-

No. 14-1764

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————————

UNITED STATES OF AMERICA,
Appellee,

v.

GERALD J. SILVA,
Defendant-Appellant.

————————————

ADDENDUM TABLE OF CONTENTS

————————————

1.   District court's published opinion ............................................................ 1

2.   District court's rulings denying pre-trial motions............................... 7

Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Rhode Island.
UNITED STATES of America
v.
Gerald J. SILVA, Defendant.

Cr. No. 13–043 S.
Signed June 9, 2014.

Terrence P. Donnelly, U.S. Attorney's Office, Providence, RI, for United States of America.

Robert B. Mann, **Mann** & Mitchell, Providence, RI, for Defendant.

### OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

**\*1 Gerald Silva** was recently tried and convicted in this Court on six counts of receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) and one count of possessing child pornography in violation of 18 U.S.C. § 2252(a)(4). Following the close of the government's case against him, Silva moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Silva renewed this motion following the return of the jury's verdict. In both instances, the Court denied the motion. Silva has now filed the instant Motion for a New Trial and Renewed Motion for Judgment of Acquittal (ECF No. 72). For the reasons that follow, Silva's motion is DENIED.

I. Background [FN1]

> FN1. The Court has gleaned the facts from the trial record and views them in the light most favorable to the government. *See United States v. Reeder,* 170 F.3d 93, 102 (1st Cir.1999).

Silva's prosecution took place following a joint investigation by the United States Postal Inspection Service ("USPIS") and the Toronto Police Service ("TPS"). The investigation concerned a Canadian company located in Toronto that did business under the name of Azov Films ("Azov"). Azov operated a website through which it sold, among other products, videos and photographs depicting nude prepubescent boys.

The government's case opened with testimony by several of the TPS officers involved in the Azov investigation. This testimony suggested that in May 2011, Canadian law enforcement executed a search warrant at Azov's offices. In the course of the raid, TPS officers shut down Azov's website and seized and analyzed a variety of business records.

These records led investigators to a large number of individuals who had purchased materials from Azov, including Silva. The government presented evidence that Silva had purchased some 75 different titles in 22 separate orders from Azov during a six-month period from October 2010 to April 2011, at a total cost of nearly $1, 600. These materials were sent to Silva's residential address in Coventry, Rhode Island.

The government's principal witness was USPIS Inspector Michael Connelly ("Connelly"), the case agent responsible for the Silva investigation. Connelly testified, in relevant part, that he led the execution of a search warrant at Silva's home which uncovered the materials that Silva had purchased from Azov. [FN2] Through Connelly's testimony, the government introduced short clips of the videos underlying the seven counts against Silva, as well as several "bonus" photo DVDs that Silva had ordered. The videos included titles such as "FKK Waterlogged," "Vladik Remembered," and "Cutting Room Floor—Vlaviu."

> FN2. Silva contended that he was collecting these materials for use in a presentation on the sexual seduction of minors.

Page 2
Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

The video clips and photos depicted young boys (seemingly between the ages of approximately five and sixteen) engaged in various activities, almost always in the nude. These activities varied from film to film, but included swimming, dancing, massaging one another with oil on a bed, and having a food fight. In virtually all instances, the boys were fully nude with their genitals plainly visible, though there were occasional scenes in which the boys were at public facilities and were wearing bathing suits.

**\*2** Connelly's testimony called jurors' specific attention to a handful of scenes and photographs. Among them was a scene in "Cutting Room Floor—Vlaviu" in which a nude boy repeatedly sat atop a basketball while rubbing food on his genitals. In another scene, from "Vladik Remembered," three nude boys wrestled and massaged one another with oil on a bed.

Although the government presented only short segments of the films, Silva later testified in his own defense. While Silva was on the stand, the defense played the full length of all of the videos at issue in the case.[FN3] The full-length films revealed more of the same type of material shown in the government's clips, and neither party suggested that the clips did not accurately represent the nature of the films.

> FN3. Many of the films were played at 2x or 4x fast-forward speed by agreement of the parties.

Following jury instructions and closing arguments, the jury deliberated for less than an hour before returning a guilty verdict on all counts.

## II. Renewed Motion for Judgment of Acquittal

### A. Standard of Review

The Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). Nevertheless, a defendant seeking relief under Rule 29

faces an uphill battle. In considering a motion for acquittal, the Court must determine "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Pomales–Lebron, 513 F.3d 262, 267 (1st Cir.2008) (citations omitted) (internal quotation marks omitted).

### B. Analysis

Silva proffers two arguments in support of his renewed motion for judgment of acquittal: (1) the government failed to carry its burden of proving that the images in question were lascivious; and (2) the government failed to prove that Silva "knowingly" received child pornography. Both are unavailing.

#### 1. The Lasciviousness Requirement

Conviction under 18 U.S.C. § 2252(a)(2) for receipt of child pornography, and under § 2252(a)(4) for possession of child pornography, requires a finding that the minors depicted were engaged in "sexually explicit conduct." See 18 U.S.C. §§ 2252(a)(2)(A) and 2252(a)(4)(B)(i). The term "sexually explicit conduct" is defined in relevant part as the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v). Silva suggests that the Azov films that he purchased contained mere nudity, and that the government did not prove beyond a reasonable doubt that the images in question depicted the lascivious exhibition of the genitals.

The First Circuit has counseled that "[s]ubject to motions under Rule 29 [ ], it is up to the *jury* to determine whether the images ... constitute ... lascivious exhibition of the genitals or pubic area." United States v. Frabizio, 459 F.3d 80, 85 (1st Cir.2006) (internal quotation marks omitted). In assessing the lasciviousness of the materials in question, courts in this Circuit apply the so-called *Dost* factors. See United States v. Amirault, 173 F.3d 28, 32 (1st Cir.1999). Nevertheless, trial judges have

© 2014 Thomson Reuters. No claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

been cautioned that these factors, while "generally relevant" and capable of "provid[ing] some guidance," are "neither comprehensive nor necessarily applicable in every situation." *Id.; see also Frabizio,* 459 F.3d at 88 ("There are many reasons for the need for caution about the use of the *Dost* factors....").

**\*3** The First Circuit has described the *Dost* factors as follows: (1) whether the genitals or pubic area are the focal point of the image; (2) whether the setting of the image is sexually suggestive (i.e., a location generally associated with sexual activity); (3) whether the child is depicted in an unnatural pose or inappropriate attire considering her age; (4) whether the child is fully or partially clothed, or nude; (5) whether the image suggests sexual coyness or willingness to engage in sexual activity; and (6) whether the image is intended or designed to elicit a sexual response in the viewer. *Amirault,* 173 F.3d at 31 (citing *United States v. Dost,* 636 F.Supp. 828, 832 (S.D.Cal.1986), *aff'd sub nom., United States v. Wiegand,* 812 F.2d 1239, 1244 (9th Cir.1987)). With respect to the fourth factor, the First Circuit has counseled that "mere nudity" is insufficient to independently establish lasciviousness. *Id.* at 33.

At trial, the Court instructed the jury as to the specifics of the *Dost* factors, and informed the jury that it could (but was not required to) consider them. Jurors were told that it was up to them to decide the weight, or lack of weight, to be given to each factor, and they were further instructed that they could consider other factors specific to the case.

The jury deliberated for less than an hour before returning a guilty verdict, suggesting that it had little difficulty characterizing the materials as lascivious. Nevertheless, the Court is mindful that where, as here, the defendant seeks relief under Rule 29, a separate judicial finding of evidentiary sufficiency is required. *See Frabizio,* 459 F.3d at 85 .

It is the opinion of this Court that the government's evidence was more than sufficient to sustain a conviction. The Court has assessed the evidence in light of the *Dost* factors, as well as other factors that the defense has brought to the Court's attention, including that Silva is a "nudist" and that Azov marketed the films in question as promoting nudism.

With respect to the *Dost* factors, the Court finds as follows:

*(1) Whether the genitals or pubic area are the focal point of the image:*

As a general matter, the videos and images in evidence depict young, prepubescent boys at play. In most all instances, they are fully nude, though in several scenes they are wearing bathing suits. The videos and images generally display the boys' bodies in full, rather than focusing on the genitals or other areas. Nevertheless, many of the still images focus on the genital area, and other scenes draw attention to the genitals in various ways (including, for example, a scene involving the young boy atop the basketball, and another scene in which three young nude boys are interviewed while sitting on a couch with the camera located at the level of their genitals).

*(2) Whether the setting of the image is sexually suggestive (i .e., a location generally associated with sexual activity):*

**\*4** The settings vary widely. The children are shown variously on beaches, at pools, in private homes, aboard trains in "sleeper" cars, in saunas, and in myriad other locations. While, as a general matter, it cannot be said that all of the settings are sexually suggestive, several of the more intimate scenes (including the massage scene) depict the boys together on a bed.

*(3) Whether the child is depicted in an unnatural pose or inappropriate attire considering [their]*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**3**

Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

*age:*

> Again, the depictions vary widely from image to image. Many of the scenes depict children at play. Some are as innocuous as a group of children playing in a public swimming pool. There are, however, other scenes that depict children in highly unnatural poses, including the basketball scene and a separate scene in which a young boy rolls around while holding his ankles, plainly exposing his genitals and anal area for the camera.

*(4) Whether the child is fully or partially clothed, or nude:*

> As noted, nearly all of the scenes and images depict fully nude children.

*(5) Whether the image suggests sexual coyness or willingness to engage in sexual activity:*

> This factor weighs in Silva's favor. As discussed, the boys are most frequently depicted at play. Though they are most always nude, it cannot be said that the boys act in ways that are sexually coy, and they do not otherwise demonstrate a willingness to engage in sexual activity. If anything, they appear to be relaxed and having fun.[FN4]

> > **FN4.** The Court acknowledges that the First Circuit has strongly cautioned against reliance on this particular factor. *See United States v. Frabizio,* 459 F.3d 80, 89 (1st Cir.2006) ("Children do not characteristically have countenances inviting sexual activity, and the statute does not presume that they do. By suggesting that the child subject must exhibit sexual coyness in order for an image to be lascivious, the district court in *Dost* ran the risk of limiting the statute.").

*(6) Whether the image is intended or designed to elicit a sexual response in the viewer:*

In this Court's assessment, this factor is particularly relevant. Within the many hours of film and many hundreds of still images, there is nothing resembling a cohesive story line. Nor do the films and images seem to have any other artistic value of any kind. Indeed, the films and images seemingly depict these boys for no reason other than to showcase their nude bodies. This being the case, it is the Court's conclusion that the videos and images were almost certainly produced in order to elicit a sexual response in those who purchased them.

Viewing the evidence in the light most favorable to the government, as the Court must, the Court concludes that there was ample evidence to sustain a conviction. Based on the government's evidence against him, Silva simply cannot overcome the high hurdle imposed by Rule 29 to demonstrate the inability of a rational factfinder to conclude that the videos and images in question were of a lascivious nature.[FN5]

> **FN5.** In a footnote to his motion, Silva renews his constitutional challenge to the purported vagueness of the term "lascivious." The Court denied Silva's motion on this issue in an oral decision prior to the start of trial based on the previous rejection of the argument by both the Supreme Court and the United States Court of Appeals for the First Circuit. *See United States v. X–Citement Video, Inc.,* 513 U.S. 64, 78–79 (1994); *Frabizio,* 459 F.3d at 85. The Court declines to address this issue again here.

2. The Knowledge Requirement

Counts one through six charged Silva with "knowingly receiv[ing]" child pornography. To sustain a conviction, the government must have proven that "the defendant 'knowingly received' material that he kn[ew] contain[ed] a 'visual depiction' of a [minor] 'engaging in sexually explicit conduct.' " *United States v. Gendron,* 18 F.3d 955, 958 (1st Cir.1994). Proof that a defendant knowingly re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

ceived child pornography requires a showing of sci-
enter. *United States v. Breton,* 740 F.3d 1, 13 (1st
Cir.2014). In other words, the government was re-
quired to prove that Silva received, and knew he re-
ceived, child pornography.[FN6] *Id.* at 17. "Such
knowledge often is shown through circumstantial
evidence." *Id.*

> FN6. Conviction on count seven required
> proof that Silva knowingly possessed child
> pornography, but Silva does not raise a
> knowledge argument with respect to this
> count.

**\*5** There was ample evidence upon which the
jury could have sustained a finding that Silva
knowingly received child pornography. As an ini-
tial matter, Silva did not purchase these materials in
one fell swoop; instead, his purchases took place
over a six-month period and were separated into
some 22 separate orders. If Silva was perturbed by
his initial purchase, it did not stop him from con-
tinuing to purchase similar items from Azov.

What is more, Silva's claim that he was un-
aware that the materials contained child porno-
graphy is belied by his own actions and testimony.
Silva testified that he acquired these materials for
use in a hazily-defined presentation on the "subtle
seduction of minors with emphasis on the male
gender" that he was planning to give in loose con-
nection with his employment as a probation officer.
Silva told jurors, in effect, that the videos and im-
ages depicted young children as they were being
"groomed" to appear in adult pornography. This
suggests that Silva was aware of the illicit nature of
the materials at the time that he acquired them.

Furthermore, the government introduced the
testimony of Kenneth Bell, a detective with the
Rhode Island State Police. Detective Bell testified
regarding an email that he had received from Silva
in May 2011, shortly after the Azov website had
been disabled. In that email, which the government
characterized as an attempt by Silva to cover his
tracks, Silva notifies Bell of the Azov website and

indicates that he has "a really bad feeling about
what may be happening to those boys." Several
weeks later, after Bell had not responded, Silva
wrote again to report that the Azov website was no
longer active, stating that "I just hope that the
[producers of the films] are not scurrying back to
their home turf to re-establish themselves. I hope
that the authorities are all over them." Whether or
not Silva wrote these emails to cover his tracks as
the government suggests, they establish definitively
that Silva knew that the materials were pornograph-
ic in nature.

Once again viewing the evidence in the light
most favorable to the government, there was suffi-
cient evidence to demonstrate that Silva knew at the
time of purchase and receipt that the videos and im-
ages in question contained child pornography. For
this reason, Silva is not entitled to relief under Rule
29.

III. Motion for a New Trial

"Upon the defendant's motion, the court may
vacate any judgment and grant a new trial if the in-
terest of justice so requires." Fed.R.Crim.P. 33(a).
"In considering a motion for a new trial, district
courts may 'weigh the evidence and evaluate the
credibility of witnesses, ... [but] the remedy of a
new trial is sparingly used, and then only where
there would be a miscarriage of justice and where
the evidence preponderates heavily against the ver-
dict.' " *United States v. Merlino,* 592 F.3d 22, 32
(1st Cir.2010) (quoting *United States v. Wilkerson,*
251 F.3d 273, 278 (1st Cir.2001)). "Because the
district court must generally defer to a jury's cred-
ibility assessments, ... '[i]t is only where exceptional
circumstances can be demonstrated that the trial
judge may intrude upon the jury function of credib-
ility assessment.' " *Id.* at 32–33 (quoting *United
States v. Cote,* 544 F.3d 88, 101 (2d Cir.2008)).

**\*6** At trial, the jury viewed firsthand all of the
evidence at issue. Jurors heard testimony from
Silva himself, who attempted to explain his pur-
chases from Azov as research for his presentation
on the seduction of minors. The jury rejected this

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)
**(Cite as: 2014 WL 2573334 (D.R.I.))**

explanation, and, for the reasons previously discussed, reasonably concluded that the videos and images in question constituted child pornography. In sum, there is no basis upon which to grant Silva the "exceptional" and "sparingly used" relief that he seeks.

IV. Conclusion

For these reasons, Silva's Motion for a New Trial and Renewed Motion for Judgment of Acquittal is DENIED.

IT IS SO ORDERED.

D.R.I.,2014.
U.S. v. Silva
Not Reported in F.Supp.2d, 2014 WL 2573334 (D.R.I.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  13-043S
                          *
VS.                       *  JANUARY 23, 2014
                          *
GERALD SILVA              *  PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Defendant's Motions in Limine)

**VOLUME II**

**REDACTED**


**APPEARANCES**:

FOR THE GOVERNMENT:          TERRENCE P. DONNELLY, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT:           ROBERT B. MANN, ESQ.
                             Mann & Mitchell
                             One Turks Head Place
                             Suite 610
                             Providence, RI  02903


Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

1    at regular speed.

2             THE COURT:  All right.  Thank you.

3             Let me just deal with this motion now.  First,

4    let me take up this argument that Professor Leo should

5    be allowed to testify as a form of summarization under

6    Rule 1006.

7             First of all, I don't think that this

8    necessarily qualifies as a situation where the content

9    of the recordings cannot conveniently be examined in

10   court.  I agree they may be lengthy, but it is not a

11   situation where it's extremely difficult for the jury

12   to put together all sorts of data that comes from

13   various kinds of records and places and would have to

14   make all sorts of independent calculations.  You

15   sometimes see a summary witness put all that data

16   together into a chart or a graph or whatever it may be.

17            This isn't that kind of situation.  It's just a

18   matter of how much time the jury and the Court and

19   everyone invests in watching and that's totally within

20   your call as advocates.  So I don't think it qualifies

21   at the outset as material that cannot be conveniently

22   examined in court.

23            Beyond that, after listening to Professor Leo's

24   testimony, there's not any chance that he would be

25   capable of succinctly presenting what's in those

1    videos.  He was rambling and unfocused, talking about

2    one video and another video, and he was all over the

3    place.  So I don't even think, if I did conclude that

4    the material could not be conveniently accessed in

5    court, that he would be an adequate summary witness.

6    So I'm going to deny the motion to allow him to be

7    presented in that fashion.

8         Now, with respect to his qualifications as an

9    expert, the Rule 702 standard that you've all cited to

10   talks about whether the -- if the expert is qualified,

11   and his knowledge would help the trier of fact

12   understand a fact in issue.

13        So as I understand it, Professor Leo is an

14   expert in film and filmmaking, assuming that that's his

15   expertise, I think that his testimony and the offer of

16   proof doesn't establish that he could be helpful to the

17   trier of fact on any of the issues that they're going

18   to have to consider.

19        Just pulling out of his own testimony, first of

20   all, he clearly stated as I mentioned in my questions

21   to Mr. Mann earlier, that he doesn't know any of the

22   purposes or reasons why a purchaser would purchase

23   these videos.  That's what he testified to.  So he

24   can't express an opinion on that.

25        So then I suppose there's the question of

**9**

1    whether he could testify on this issue of why someone

2    would produce such a video.  He did not express any

3    expertise that would allow him to help the jury on the

4    why or the intent of the producer.  He had some

5    opinions.  They were very vague.  And at some point I

6    think, as Mr. Donnelly said, he said something like,

7    well, there could be a lot of reasons, or as

8    Mr. Donnelly said, he took issue with this plot

9    question, sort of claimed there could be a narrative in

10   there someplace, but he basically characterized it as a

11   home movie.  It's not as if he, as I thought he might,

12   I thought he might be presented to testify as to some

13   genre of European film and nudity or something that

14   this could have fit into, but he doesn't appear to have

15   any opinions about that.  These are home movies,

16   essentially.

17       He also said he hasn't written on issues of

18   nudism, so I don't think he has any particular

19   expertise in that area.  He said something to the

20   effect that physicality is part of his study expertise.

21   I'm not even sure what that even means.  But the long

22   and the short of it is that I don't think he can

23   testify as to the reasons why someone would produce

24   this other than just giving essentially a lay opinion

25   on that.

**10**

1          I don't think there's anything about his area of

2     expertise that would inform the jury as to why, the

3     intent of the person producing the film.

4          So that knocks out that sixth <u>Dost</u> factor and

5     issues that the Circuit talked about in the <u>Frabizio</u>

6     opinion that go beyond the <u>Dost</u> factors.

7          So then when you look at the <u>Dost</u> factors

8     themselves, as I go through them, whether the focal

9     point of the images are genitals or pubic area.  I

10    think the jury can figure that out for themselves.  I

11    don't think I heard anything in his testimony as to

12    anything about any particular film or part of a film

13    where what his understanding or expertise could really

14    inform the jury as to why those areas were not the

15    focal point even though they might have seemed to be

16    the focal point.  I didn't hear that from him.

17         His opinions about whether a setting is sexually

18    suggestive, I think Mr. Donnelly made the point he's

19    testifying that these various settings were not

20    sexually suggestive.  I think a juror might find that;

21    they might find differently, but there's nothing about

22    his expertise that tells us whether these settings are

23    sexually suggestive.  So I don't see him qualified or

24    helpful to the jury there.

25         Same with the third <u>Dost</u> factor regarding

**11**

1    unnatural poses or inappropriate attire.

2         Fourth one, whether the child is partially

3    clothed or nude.  He's not offered for anything

4    relating to that.

5         The suggestion of sexual coyness or willingness

6    to engage in sexual activity, I didn't hear him talk

7    about that.  Again, that comes back to his sort of ipse

8    dixit opinions that these are not sexualized images or

9    evoke sexual connotations because he says they aren't,

10   and that's not what 702 allows.

11        So in a kind of summary fashion, those are the

12   reasons why I don't think his testimony would be

13   helpful to the jury.  I do agree that _Frabizio_ implies

14   to me that while not prohibited, there's certainly no

15   requirement and no compulsion to allow expert

16   testimony.  If there's any trend, from my reading of

17   the cases, it is against allowing expert testimony on

18   this issue of lasciviousness.

19        So for all the reasons that I've stated and

20   articulated in _Frabizio_ and in _Arvin_ and all the other

21   cases that have been cited, I'm going to deny the

22   motion to allow Professor Leo to testify.

23        So we can move on to the other motions.  There

24   is a motion, Mr. Mann, you've made that the term

25   "lascivious" is unconstitutionally vague, and then I

**12**

1    believe you also had a motion regarding Count VII

2    relating to the grand jury's viewing of the material.

3    Do you want to address those?

4         MR. MANN:  Which one do you want me to address

5    first?

6         THE COURT:  Why don't you take the

7    constitutional argument first.

8         MR. DONNELLY:  Judge, just so I'm clear,

9    Mr. Mann had filed a motion to dismiss based on

10   insufficient evidence being put before the grand jury

11   as to all the counts, I believe, and then followed it

12   up with Count VII.

13        THE COURT:  I thought he had -- maybe I

14   misunderstood.  What don't you clarify what your motion

15   is.

16        MR. MANN:  Mr. Donnelly is right.  I had

17   originally filed a motion challenging the sufficiency

18   of the evidence as to all counts.  Based on the Bill of

19   Particulars, I filed a further motion specifically

20   challenging Count VII, so I do challenge all seven

21   counts.  They are different arguments, but I'll address

22   the constitutional argument first.

23        THE COURT:  Okay.  Go ahead.

24        MR. MANN:  I can just get my notes, Judge?

25        THE COURT:  Sure.

**13**

1    problem.

2              THE COURT:  All right.  Thank you.

3         Mr. Mann, I'm not unsympathetic to your

4    arguments.  I think there is vagueness that is inherent

5    in the statutory language, but I have to agree with

6    Mr. Donnelly that the holdings of the First Circuit in

7    Frabizio, while I don't think it was directly in front

8    of them, and that combined with the holdings of

9    X-Citement Video and the various circuit courts that

10   have confronted this question directly of whether this

11   is unconstitutionally vague all held that it's not, and

12   so I am going to deny the motion.  I think what the

13   case law teaches us is that we can work with this

14   statutory language informed by the case law, the Dost

15   factors and the other cases, pattern jury instructions,

16   such that the jury can make a common sense

17   determination of whether these movies meet the

18   statutory definition of "lascivious exhibition."  So

19   for that reason, I'm going to deny the motion.

20             Now, we can move on to your other motion.

21             MR. MANN:  Yes, your Honor.

22        Judge, I have a document I'm going to offer as

23   an exhibit to this motion.  It's part of the record.

24   It's the Government's response to the motion for a Bill

25   of Particulars.  It informs part of this argument.

**14**

1    business, and Costello says that calls for a trial and

2    that's what we'll have.  Thank you.

3         THE COURT:  All right.  Thank you.

4         Okay.  Well, once again, I think the case law is

5    stacked very much against your arguments, Mr. Mann.

6    And while one might have a view that perhaps the

7    Government should produce more information to the grand

8    jury to support an indictment, that's a call that's

9    made by the prosecutor, not by the defendant or the

10   Court.  And I think the prosecutor has the discretion

11   to marshal the evidence that's going to be shown to the

12   grand jury or summarize for the grand jury in the way

13   that it believes efficiently utilizes the grand jury's

14   time subject to the probable cause standard.  And as

15   Mr. Donnelly has indicated, the Costello case seems to

16   foreclose the challenge that you've brought.  The Court

17   said, "An indictment returned by a legally constituted

18   and unbiased grand jury that's valid on its face is

19   enough to call for a trial of the charge on the merits

20   and the Fifth Amendment requires nothing more.  Other

21   courts have rejected similar challenges about the

22   sufficiency of the indictment where grand jurors viewed

23   only portions of the material alleged to constitute

24   child pornography.  The **United States versus Brose** in

25   the Western District of New York, again, a sampling of

**15**

1    some 1300 images.  **United States versus McLay** in the

2    District of Maine, similar challenge.  And it appears

3    from the grand jury transcript here that the grand

4    jurors did review snippets of these various films,

5    "Waterlogged" -- "FKK Waterlogged," "V█████ Remembered,

6    Volume I," and that they were provided with detailed

7    descriptions of all the additional films by the postal

8    inspector.  So I think that these cases, particularly

9    Costello combined with the evidence of what the grand

10   jury considered requires me to reject this challenge to

11   the indictment, so I'm going to deny the motion.

12        MR. MANN:  I understand the Court's ruling, but

13   I'm just concerned about one part of the Court's

14   ruling.

15        THE COURT:  Sure.

16        MR. MANN:  You said that the grand jury had been

17   provided -- a detailed description had been provided,

18   descriptions of all the films.  Just so the record is

19   clear, I thought I had made this clear, they were not

20   provided a description of the films that were the basis

21   of Count VII.

22        THE COURT:  Right.  And that then takes us back

23   to the Government's response on the Bill of

24   Particulars, right?

25        MR. MANN:  Right.  So my only point is that I

1    thought you had said they had been provided a

2    description of all the films.  I just wanted to make

3    the record clear that they had not been, and I thought

4    I made that clear both in my memo and I thought I made

5    it clear earlier.  I just want to point that out,

6    Judge.

7            THE COURT:  I think you're right.  It's not all

8    films.  I think it was a number of the films and the

9    Government --

10           MR. MANN:  None that were the basis of Count

11   VII.

12           THE COURT:  Well, the Government says in its

13   response to the Bill of Particulars that to prove Count

14   VII it will not rely on the images charged in Counts I

15   through VI of the indictment but will rely instead on

16   the items delineated on the attached charge.  Now,

17   you've submitted this charge, right?

18           MR. MANN:  Yes.

19           THE COURT:  So your point is as to Count VII,

20   the grand jury did not review snippets of those three

21   films that are referred to.  That's your point.

22           MR. MANN:  And that there was no description of

23   them.

24           THE COURT:  No description presented to the --

25           MR. MANN:  In other words, with respect to Count

**17**

1    VII, Judge, there simply was nothing before the grand

2    jury.  They didn't hear a description of those films;

3    they didn't see snippets of them.  I agree they had

4    descriptions with respect to Counts III through VI and

5    snippets of I and II, I think it was.  But on Count

6    VII, Judge, Mr. Donnelly provided an answer to the Bill

7    of Particulars.  It listed which films were the basis

8    for each count.  With respect to the ones for Count

9    VII, there's just no reference to it whatsoever.

10         THE COURT:  Well, correct me if I'm wrong, but

11   isn't the evidence that was before the grand jury that

12   these were all films that were procured from the same

13   producer, this Azov Films; is that right?

14         MR. MANN:  I think that's a fair, general

15   summary.

16         THE COURT:  All right.  So if the indictment

17   charges that the Defendant was in possession of these

18   films and these films were acquired from Azov Films,

19   then isn't that indictment given the same deference

20   that Costello requires?

21         MR. MANN:  And the reason I would say no is

22   this.  I think a fair reading of the grand jury

23   proceedings also indicates that they seized films that

24   the Government doesn't allege were child pornography.

25   At some point in some way the grand jury had to make a

**18**

1    decision about whether or not the films that are the

2    basis for Count VII were child pornography, and they

3    didn't know about those films.  They knew there were

4    films seized from Azov, some of which were described as

5    pornographic; some of which weren't, but there's no

6    reference whatsoever to the films that were the basis

7    for Count VII.  The argument as to Count VII is

8    demonstrably different than it is to Counts I through

9    VI.  Counts I through VI deal with de minimus evidence,

10   those sort of things.  Count VII says there's no

11   evidence, zero evidence before this grand jury as to

12   those films that are the basis for Count VII.  That's

13   why I think the argument is so compelling is that Count

14   VII -- and I apologize for standing up after your

15   decision, but the reason I did was because I thought

16   you had indicated they'd all been summarized for the

17   grand jury and the ones in Count VII clearly were not.

18        THE COURT:  If I said that, I didn't mean to

19   imply that those were -- and I should have listed the

20   ones that were summarized.

21        MR. MANN:  And that's my only point that I want

22   to make the record very clear and if the Court

23   reconsiders its decision based on that, fine; and if it

24   doesn't, I understand the Court's ruling but I just

25   wanted to make the record very clear as to what I think

**19**

1     it is.

2          THE COURT:  Right.  What do you say to that,

3     Mr. Donnelly?  I guess I'm not sure you really did

4     address that reality.

5          MR. DONNELLY:  I thought I did, your Honor.

6     One, as I cited in our initial memorandum, we just

7     shouldn't be here doing this.  In the **United States**

8     **versus Guerrier**, the First Circuit held when the same

9     types of claims were made there that we could do --

10    "Ultimately, we could do no better than repeat what the

11    Supreme Court said in a related context over 55 years

12    ago.  In the ordinary course of events, a technically

13    sufficient indictment," we have that here, nobody's

14    disputing that, "handed down by a duly impaneled grand

15    jury," we have that here, "is enough to call for a

16    trial of the charge on the merits."

17         And every time that defendants have raised

18    sufficiency arguments before the grand jury, they have

19    been rejected time and again particularly in this

20    Circuit.  I know of no instance in this Circuit where

21    such an argument as Mr. Mann has made has been allowed.

22    That's why I pointed out to the Court, however, if the

23    Court is concerned in any way, the fact that the

24    totality of the evidence here, given the standard that

25    is applied, probable cause, is more than enough to

1    generate probable cause for the grand jury to issue the

2    indictment.

3        THE COURT:  All right.  Okay.  Well, I think the

4    record has been made clear, Mr. Mann, and I think

5    ultimately I have to defer to the Costello case and the

6    progeny of Costello on this.  And so you've clarified

7    the record, and I stand corrected as to what I said,

8    but the motion to dismiss on that basis with respect to

9    Count VII is denied as well.

10        Okay.  I think that wraps it up.  Is there

11   anything else that we need to do today?

12        MR. DONNELLY:  Nothing from the Government, your

13   Honor.

14        MR. MANN:  Not for the defense.

15        THE COURT:  Let's go off the record.

16        (Discussion off the record.)

17        (Court concluded at 4:10 p.m.)

18

19

20

21

22

23

24

25

**21**